[Nos. A033064, A039161. First Dist., Div. One. May 18, 1988.]

IRENE O'CONNELL KRUSE, Plaintiff and Appellant, v. BANK OF AMERICA, Defendant, Cross-defendant and Appellant; CHARLES DUCK, as Trustee, etc., et al., Cross-complainants and Appellants.

**COUNSEL**

William M. Lukens, Donald F. Drummond, Carol G. Perry, Lukens, Cooper, Perry & Drummond, Martha Rosenberg, Frederick E. Watson, Eugene Crew, Michael N. Khourie and Khourie & Crew for Plaintiff and Appellant.

Warren Christopher, Robert C. Vanderet, Karen R. Growdon, Carmen R. Luege, Glenn W. Trost, Gregory G. Corbeill, O'Melveny & Myers, David B. Flinn and Leland, Parachini, Flinn, Steinberg, Matzger & Melnick for Defendant, Cross-defendant and Appellant.

A. Barry Cappello, Thomas G. Foley, Jr., Frances E. Komoroske, Leila J. Noel and Capello & Foley for Cross-complainants and Appellants.

## OPINION

RACANELLI, P. J.—

### INTRODUCTION

The underlying litigation arises out of a series of related loan transactions involving apple growers and processors and the Bank of America (Bank) under the evolving theories of lender liability. Following a three-month trial, the jury returned a verdict against the Bank and in favor of plaintiff and cross-complainants aggregating $20,020,000 in compensatory damages and $26,675,000 in punitive damages.

The trial court granted the Bank's motion for a new trial as to punitive damages only, conditioned on plaintiff's and cross-complainants' acceptance of a remittitur to $6 million in punitive damages; the remittitur was duly accepted. The Bank appeals, contending, inter alia, that no basis for liability for damages has been shown. Plaintiff and cross-complainants have cross-appealed seeking to reinstate the full award of nearly $47 million and to recover counsel's travel expenses.

### FACTUAL BACKGROUND

Viewing the evidence, as we must, in a light most favorable to the judgment (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]), we narrate the factual background in some detail in order to discuss adequately the several issues raised in this extensive litigation.

George M. Jewell,[1] like his father before him, has been a well-established apple grower in the Sebastopol area for many years. By the early 1960's, George M. Jewell had developed an apple brokerage business, operated as a joint venture with his son, George R. Jewell. In addition to apples grown on their own ranch, the Jewells bought and collected apples grown by independent growers for sale to processing plants producing apple juice, dehydrated apples, applesauce, vinegar and other kindred products. At this time, about 80 percent of the apples harvested in the Sebastopol area were sold for processing purposes, and the remaining crop yield marketed as fresh fruit.

The two major apple processors in Sebastopol were the family-owned James O'Connell Company and the Sebastopol Cooperative Cannery (Co-

---

[1] For ease of reference, the respective parties will be designated by their proper names unless otherwise indicated. Since the interests of the senior Jewells and the trustee-in-bankruptcy are identical, we will refer herein only to the former.

op). The Co-op processed apples grown by its members but also purchased apples from nonmembers or "independents" whenever the supply of apples from its members was inadequate. The Jewells had supplied apples to the O'Connell Company, the principal Sebastopol outlet for independent growers, for a great many years.

## 1. *The Near Collapse of the O'Connell Company*

James O'Connell died in 1971, and his widow, Mrs. Irene (O'Connell) Kruse became the sole owner of the family corporation. Management of the business operations was entrusted to her 19-year-old son, Dan O'Connell.

The O'Connells had been long-standing customers of the local Bank, which had consistently funded their yearly operations. But in 1974, the Bank suddenly denied Dan O'Connell's request for a capital improvement loan for the O'Connell Company's processing plant. The following year, much to O'Connell's surprise, the Bank refused to provide the customary annual line of credit to fund the company's business operations. William (Bill) Sullivan, the manager of the Bank's Sebastopol branch, extended some interim relief in the form of overdraft privileges approved as short-term loans secured by inventory and receivables; but without the annual loan funds, the O'Connell Company was soon unable to pay its creditors.

In April and May 1975, the Taylor-Doyle Company, one of O'Connell's major suppliers, obtained two judgments against the O'Connell Company for the sale of apples.[2] A sheriff's sale was scheduled in January 1976 to liquidate the O'Connell properties to satisfy the unpaid judgments.

Sometime during the summer of 1975, the Jewells learned of Dan O'Connell's business plight. Acting upon his son's suggestion, George M. Jewell agreed to assist O'Connell financially. In addition to his interest in keeping "a port open" for his suppliers, the independent growers, Jewell also wanted to aid his fellow farmer.[3]

The Jewells were themselves long-standing customers of the Bank. George M. Jewell spoke to Bill Sullivan and told him of his desire to assist O'Connell. Sullivan soon arranged to lend George M. Jewell $150,000, which he could, and did, in turn loan to the O'Connell Company to discharge the unpaid judgments and to settle other pressing debts. On Sullivan's advice, Jewell obtained a promissory note for the $150,000 loan

---

[2] The Taylor-Doyle lawsuits were initiated after Sullivan revealed to a company director (also a bank officer) that the Bank had withdrawn its financing of the O'Connell Company.
[3] The Jewells were instrumental in setting up an informal trust fund for the O'Connell Company with contributions from other farmers in the community.

secured by a second deed of trust ·on the O'Connell property. (The Bank held the first deed of trust securing an earlier outstanding loan.)

Later that same year (1976), Jewell borrowed an additional $114,000 from the Bank to lend to the O'Connell Company to finance an equipment purchase; that loan was secured by another (third) deed of trust. And in August 1977, Jewell borrowed another $150,000 from the Bank which he again in turn loaned to O'Connell to enable the O'Connell Company to pay off an outstanding loan owed to the Bank.

George M. Jewell provided other assistance to the troubled O'Connell Company as well: he gave financial advice; he assisted in negotiations with O'Connell's suppliers to extend terms of payment; and he began to supply the O'Connell Company with large quantities of apples on credit alone.

### 2. Financing of New O'Connell Company Plant

By 1977, the O'Connell Company had been ordered by a state regulatory agency to make substantial improvements in its wastewater treatment facilities or to cease and desist operations. Confronted with the formidable competition presented by the new Co-op dehydration plant,[4] Dan O'Connell decided to construct his own new dehydrating facility. Following O'Connell's positive discussion with George M. Jewell, the latter then discussed the idea with Bill Sullivan, who was equally enthusiastic about the proposed project. In view of the Bank's unwillingness to grant any further loans to the O'Connell Company, George M. Jewell undertook responsibility to obtain the necessary financing.

In December 1977, George M. Jewell and his wife, Betty, met with Sullivan to discuss a $1 million loan for the project payable over 20 years and to be secured by the new O'Connell plant. The Jewells were also to obtain an additional loan from the Bank to finance a lease-purchase arrangement whereby they would personally acquire ownership of a new "Proctor-Schwartz" dehydrator and lease it back to the O'Connell Company. After the December 1977 meeting, George M. Jewell believed that the Bank would provide long-term financing on the O'Connell plant. The following month, upon receiving a firmer estimate of construction costs from Dan O'Connell, George M. Jewell again met with Sullivan and told him that O'Connell would need $1.2 million. Sullivan replied that the Bank would not make the loan if Dan O'Connell remained as manager of the new

---

[4] In 1977, the Co-op embarked on the construction of a large dehydration facility to accommodate the expanding market for dehydrated apples. The Bank agreed to provide the necessary construction loan and long-term financing. Upon completion of the facility in 1979, the Bank had loaned the Co-op $17.7 million.

plant. Reacting with surprise, George M. Jewell responded that he would not "kick Dan out of his own business."

Concluding that Bank financing was a "dead issue," the Jewells began searching for alternate financing. They were soon able to obtain a $650,000 loan for the O'Connell project from North Coast Production Credit Association (PCA) evidenced by a seven-year promissory note (repayable at $10,000 per month), the maximum terms available from PCA in a single loan. George R. Jewell agreed to, and did, pay the monthly installments to PCA on behalf of the O'Connell Company. Construction of the new plant began in May 1978.

After the Jewells obtained the PCA loan, Sullivan told George M. Jewell that "the boys down below [Sullivan's superiors in the San Francisco regional credit office] kicked their butt for not taking the whole thing." George M. Jewell interpreted the statement to mean the Bank was interested in providing a long-term loan.

George M. Jewell knew that Sullivan did not have authority to approve large loans. (Sullivan's independent lending authority was apparently limited to $100,000.) Under the Bank's regular procedures, the branch officials were required to prepare a credit report (form CR-115) to be forwarded to the regional credit office for review and approval by an authorized credit officer.

During the early part of 1978, George M. Jewell met with Sullivan frequently to discuss the long-term financing needed for the O'Connell plant. In April 1978, Dan O'Connell began furnishing Sullivan with periodic progress reports on the construction work. Sullivan suggested various design changes for the plant to avoid its possible classification as a specialized-use building operation. Sullivan knew that the regional credit office was reluctant to finance specialized buildings not readily convertible to other uses.

In the spring of 1978, George M. Jewell applied to the Bank for a $400,000 equipment loan to purchase the Proctor-Schwartz dehydrator. During the review by the Bank's regional credit office, Sullivan's superiors requested additional information concerning Jewell's equity interest in the O'Connell Company. As a consequence, Sullivan suggested to George M. Jewell that he should acquire controlling ownership of the O'Connell Company.

The equipment loan application was delayed for several months while the question of Jewell's ownership interest was being considered by Bank

officials. In August, when the Bank had yet to approve the loan application, the Jewells returned to PCA. George M. Jewell then borrowed $370,000, and his son, $130,000, to finance the purchase of the Proctor-Schwartz dryer.[5] Thereafter, the Jewells modified their loan request to the Bank, which eventually approved a loan in the amount of $209,000 for equipment purchases for the O'Connell plant.

In November 1978, Sullivan invited the Jewells to a luncheon meeting with his superior, Norman Jensen. The two Bank officers visited the O'Connell construction site; neither man expressed any reservations about possible financing.

In December 1978, Sullivan strongly urged George M. Jewell to obtain a controlling interest in the O'Connell Company, explaining that it was becoming "difficult if not impossible" for the Bank to continue investing in the O'Connell project without Jewell possessing a controlling interest. George M. Jewell, aware of Sullivan's interest in wanting to protect himself (Jewell) and the Bank, believed that unless he had some equity ownership in the O'Connell Company, the Bank would not provide long-term financing.

On January 7, 1979, George M. Jewell met with Mrs. Kruse and her family and explained the Bank's insistence that the Jewells have a controlling interest in the O'Connell Company as a condition to the continued financing of the dehydrating plant. She reluctantly agreed to transfer a majority of her stock to George R. Jewell for $180 with the expectation that the stock would be returned once the Bank funded the long-term loan enabling the O'Connell Company to repay the Jewells.

The Jewells and Dan O'Connell anticipated that the PCA construction loan, together with the equipment loans, would be sufficient to pay the costs of the dehydrating plant.[6] However, by the spring of 1979, project cost over-runs required George M. Jewell to borrow additional sums from the Bank which he then loaned to the O'Connell Company. Thus, in March 1979, he first exhausted his $650,000 annual operating line of credit, then obtained Sullivan's approval for extended credit of an additional $445,000, or a total indebtedness of $1,095,000. Sullivan told George M. Jewell that something would be "worked out" at the end of the year.

The Jewells optimistically anticipated long-term financing which would permit consolidation of the several debts under a favorable repayment

---

[5] In April 1978, George M. Jewell had obtained a $300,000 credit line from PCA for equipment purchases for the O'Connell plant. He in turn loaned the money to the O'Connell Company.

[6] The total funds obtained exceeded $1.6 million: the four PCA loans aggregating $1,450,000 and the Bank loan of $209,000.

schedule amortized over a 20-year period. Still, they knew Sullivan himself lacked authority to approve a loan of that magnitude.

In April 1979, Sullivan and his regional office superior, Norm Jensen, again visited the O'Connell construction site. Well aware of Sullivan's inability to approve the million dollar loan package, George M. Jewell was anxious to hear Jensen's reaction. Jensen reportedly stated "it was a beautiful plant, and we're going to be able to help [you]." Jewell assumed that the statement indicated that the loan would be approved.

Sullivan shared a similar optimism of eventual loan approval by the regional credit office. In May 1979, as the project neared completion, Sullivan requested an appraisal of the O'Connell plant, the first step in preparing the customary CR-115. The Bank appraisal proved too low to justify a $1.9 million loan, motivating Sullivan to urge reconsideration by his superiors.

By August 1979, however, Sullivan realized that the regional credit office would not approve the loan. Sullivan soberly informed George M. Jewell that the Bank would be unable to provide long-term financing on the O'Connell plant. Shortly thereafter, in September 1979, Sullivan was hospitalized due to a heart ailment and retired on disability.

Meanwhile, in November 1978, George R. Jewell had opted to build a "fresh pack" plant: a facility for storing high quality apples for future sale as edible fresh fruit. However, he did not obtain conventional financing (short-term construction financing and long-term payoff loan) but elected instead to use his personal resources and annual operating line of credit to fund construction. When he applied to the Bank for a long-term real estate loan, Sullivan orally assured him the loan would be approved. In October 1979, the long-term loan was in fact approved by the Bank.

### 3. *Events Leading to Bankruptcy*

In January 1980, Roger Bunch, who succeeded Sullivan as local branch manager, approved George M. Jewell's $900,000 annual credit line and consolidated his short-term bank debts into an $850,000 loan payable over a four-year period. Bunch asked Jewell to execute deeds of trust on the Jewell Ranch as security for the loan. Jewell refused but did, however, sign an agreement not to encumber the Jewell Ranch.

In 1980, prices of processed apple products fell dramatically, due in large measure to a 1979 bumper apple crop which created a glut on the market.

The O'Connell Company sustained heavy losses that year and was unable to repay the construction loans advanced by the Jewells. The O'Connell Company was likewise unable to pay the Jewells for thousands of tons of apples supplied to the O'Connell Company for processing.[7]

By 1980, the O'Connell Company was indebted to the Jewells in the amount of $2.7 million: $1 million in loans and $1.7 million for apples supplied. The Jewells in turn were heavily indebted to their growers, to PCA, as well as to the Bank. Bunch concluded that George M. Jewell was so deeply in debt that "he wasn't going to get out." Accordingly, in September 1980, he summoned the Jewells to his office and announced that the Bank would not lend them any more funds.

In an effort to ease his financial dilemma, George M. Jewell agreed to place two "satellite" parcels of the Jewell Ranch on the market. His attempts to obtain financing from other lenders proved unsuccessful in view of the existing agreement not to encumber the Jewell Ranch. By November 1980, the O'Connell Company plant, along with the Proctor-Schwartz dryer owned by the Jewells, was placed on the market for liquidation.

On November 5, 1980, the Jewells responded to an invitation to meet with PCA and Bank officials in San Francisco. At the meeting, attorneys for PCA and the Bank strongly insisted that the Jewells liquidate their properties in order to repay the outstanding loans or risk foreclosure proceedings.

George M. Jewell broke down emotionally prompting Bunch to put his arm around him with the verbalized assurance, "Don't worry, George, we'll take care of you." During the return trip to Sebastopol, Bunch told George M. Jewell that if he would give the Bank deeds of trust on the Jewell properties as well as the proceeds derived from the sale of properties, the Bank would in turn pay the growers and protect him from the demands of PCA. A few days later, George M. Jewell and his wife executed and delivered to the Bank deeds of trust to all their real property and security agreements on their equipment.

Although the Bank never initiated foreclosure proceedings on the Jewell properties, it did insist that the Jewells liquidate the O'Connell properties to provide funds to pay off the outstanding bank loans. Meanwhile, PCA also began pressing its demands on the Jewells and the O'Connell Company for immediate payment of the outstanding unpaid loans. Indeed, PCA threat-

---

[7]George M. Jewell's long-standing commitment to pay his growers at the prices posted earlier in the season produced a negative spiral effect: the Jewells' commitment to pay their growers above-market prices resulted in commensurately higher costs of supplies to the O'Connell Company now controlled by the Jewells.

ened to file a petition for involuntary bankruptcy of the Jewells in order to invalidate the transfer of their properties to the Bank.

On November 25, 1980, Mrs. Kruse filed a fraud action against both the Jewells and the Bank seeking damages and equitable relief. Two months later, the Bank received $381,000 from the sale of the two satellite parcels and released a portion of the funds to pay the senior Jewells' attorney fees in contemplation of a voluntary reorganization petition in bankruptcy, ultimately filed by the senior Jewells on January 28, 1981. George R. Jewell filed a Chapter 11 petition the following May.

The culminated events raised doubts in the Bank officials whether to distribute the proceeds to the Jewells' creditors, including PCA and the growers, as Bunch had promised. However, the Bank eventually turned over the deeds of trust as well as the sales proceeds to the trustee-in-bankruptcy.

In July 1981, the fresh pack plant was destroyed by fire; the fire insurance proceeds were applied by the Bank to George R. Jewell's outstanding loan. The final chapter in the tragic economic collapse was written in January 1982 when the O'Connell Company also filed bankruptcy.

## DISCUSSION

The Bank's main argument on appeal is that the judgment is unsupported by the record. ■ Accordingly, the scope of our review begins and ends with the determination whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the conclusions reached by the jury. (*Estate of Leslie* (1984) 37 Cal.3d 186, 201 [207 Cal.Rptr. 561, 689 P.2d 133]; *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) In reviewing the voluminous record, we must examine all factual matters in the light most favorable to the prevailing parties and resolve all conflicts in support of the judgment. (*Estate of Leslie, supra,* 37 Cal.3d 186; *Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d 920, 925-926.)

■ "Substantial" evidence, however, is not synonymous with "any" evidence. To constitute sufficient substantiality to support the verdict, the evidence must be "reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644; see also *Braewood Convalescent Hospital* v. *Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164 [193 Cal.Rptr. 157, 666 P.2d 14]; *Yancey* v. *State Personnel*

*Bd.* (1985) 167 Cal.App.3d 478, 482-483 [213 Cal.Rptr. 634]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925].)

As we will explain, our review of the whole record in light of such governing principles discloses an absence of proof sufficient to establish the essential elements of the asserted causes of action. Therefore, we are compelled to reverse the judgments.

## I.

### JEWELLS' CROSS-COMPLAINT

The Jewells' cross-complaint against the Bank asserted theories of fraud (actual and constructive) and bad faith denial of the existence of a contract. In essence, the Jewells claimed that the Bank wrongfully induced them to borrow heavily in order to finance the O'Connell Company; that once the Jewells were hopelessly overextended, the Bank reneged on its promise to provide long-term financing to the O'Connell Company which would have enabled it to repay the Jewells; further, that after obtaining the Jewells' assets, the Bank betrayed them by failing to pay their other creditors (notably, PCA and the growers).

The jury awarded George M. and Betty Jewell $12,750,000 and George R. Jewell $4.5 million in compensatory damages based upon special verdicts finding fraud and bad faith denial of a contract. The jury also awarded the Jewells $20 million in punitive damages. We will conclude the verdicts are legally insupportable.

### A.

#### *Failure to Disclose*

The Jewells' claims of actual and constructive fraud rest on a theory that the Bank had a duty to disclose certain information before making the requested loans; that had the Bank made the required full disclosure, the Jewells would have refrained from repeatedly borrowing the large sums of money. Thus, they contend, the Bank's conduct in wrongfully inducing them to obtain loans while fraudulently concealing material facts constituted actionable fraud.

Ordinarily, failure to disclose material facts known only to one party is not actionable fraud unless there is a fiduciary or confidential relationship imposing a duty to disclose. (Civ. Code, § 1710, subd. 3; 4 Witkin, Summary of Cal. Law, Torts (8th ed. 1974) §§ 459-460, pp. 2724-2725.) The Bank

vigorously denies the existence of any fiduciary duty or any breach thereof. Moreover, the Bank claims, any fiduciary relationship that arguably existed (see generally *Rutherford* v. *Rideout Bank* (1938) 11 Cal.2d 479 [80 P.2d 978, 117 A.L.R. 383] [bank's confidential relationship with depositor-borrower]; *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017] [bank's "quasi-fiduciary" relationship with checking account holder]) was limited to the 1976-1977 loan transactions and terminated by reason of George M. Jewell's exercise of his own independent business judgment and actions in connection with the 1978-1979 financial transactions.

We need not navigate these murky waters. As will appear from our discussion, even assuming some duty to disclose existed, the Jewells have nonetheless failed to establish any cause of action based upon fraud.

### (1) *The 1976-1977 O'Connell Loans*

The Jewells first complain that in making the loans used to save the O'Connell Company ($150,000 to satisfy the Taylor-Doyle judgments; $114,000 for equipment purchases; and $150,000 to pay an old bank debt), the Bank failed to disclose: 1) critical information regarding the O'Connell Company's banking history; 2) its low opinion of Dan O'Connell as a business manager; and 3) the benefits it derived as a result of the Jewells' loans to the O'Connell Company. Moreover, they charge, the Bank also failed to advise the Jewells to seek independent legal advice (due to the Bank's "conflicting" interests) or to inform them of the resulting impact on their own financial condition.

But there is no solid, credible evidence that the financial losses sustained by the Jewells were proximately caused by the 1976-1977 loans. The loans made were secured by deeds of trust on O'Connell properties.[8] During the years 1976-1980, the O'Connell Company paid to the Jewells a total of $1.7 million. Of that amount, $296,000 was applied to the notes payable (which included a 1 percent surcharge over the Jewells' corresponding interest rate paid to the Bank). By the end of 1977, the Jewells had fully repaid the 1976 loans and open credit lines and were only indebted for the 1977 $150,000 loan used to pay off O'Connell Company's bank loan; and that debt was cleared in March 1978. Thus, at the end of 1978, the Jewells were free from debt to the Bank except for the $209,000 equipment loan.

---

[8] As earlier noted, the first loan of $150,000 was secured by a deed of trust junior to the Bank's trust deed. In August 1977, when George M. Jewell paid off the old bank loan, the Bank's senior security was extinguished.

Later, when the construction project began, the PCA loan paid off George M. Jewell's debt to the Bank, and his deed of trust was subordinated to the deed of trust held by PCA.

In point of unassailable fact, the Jewells' precarious economic condition in 1981 directly resulted from significant independent intervening factors: 1) the heavy indebtedness incurred in 1978-1979 in conjunction with the construction of the O'Connell dehydrating plant; 2) the O'Connell Company's failure to repay the construction funds borrowed from the Jewells; 3) the devastating losses suffered in the 1979-1980 apple season as a consequence of paying above-market prices to their growers; 4) the O'Connell Company's failure to repay nearly $2 million owed to the Jewells for apples delivered during 1978-1980 for processing; and 5) the bankruptcy in 1980 of a major customer of the Jewells rendering a $232,000 receivable uncollectible. The record convincingly and conclusively demonstrates that the 1976-1977 loans made to finance the O'Connell Company were not a substantial factor in the Jewells' financial collapse.

### (2) *1978-1979 Loans for Plant Expansion*

In 1978 and 1979, the Jewells borrowed well over $1 million in short-term bank loans on the assumption the Bank ultimately would give a long-term loan on the O'Connell plant. The Jewells contend the Bank fraudulently induced them to undertake the short-term borrowing without disclosing the possibility that their request for long-term financing would be denied.

Our review of the record fails to disclose evidence of sufficient substantiality to establish the essential element of justifiable reliance.[9] Testimony concerning one's own reliance is legally insufficient evidence if such reliance is without justification (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 108, p. 750); a party plaintiff's misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance. (*Ibid.*) "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, . . . he will be.denied a recovery." (*Seeger* v. *Odell* (1941) 18 Cal.2d 409, 415 [115 P.2d 977, 136 A.L.R. 1291]; see also *Gray* v. *Don Miller & Associates, Inc.* (1984)

---

[9] We find the Jewells' companion argument of culpable nondisclosure of a May 1978 internal report predicting a decline in apple acreage in Sonoma County somewhat ingenuous. Jewell's testimony that had he known of this report, he would never have become involved in the O'Connell project, defies credibility.

The report cited the same statistics contained in an earlier report that Jewell read. The first report, however, explained why those statistics were misleading in that new plantings made the yield per acre greater and land use restrictions protected agricultural land. It is unreasonable to think that the Jewells' enthusiasm and confidence about the O'Connell dehydrating plant would have been shattered by the conclusory statement in the second report that Sonoma County would likely "lose some additional apple acreage during the next 5 years," particularly where the first report noted the same reduction in acreage but explained a favorable outlook for an increased apple supply.

35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253, 44 A.L.R.4th 763].) Quite simply, the Jewells' hopeful expectations cannot be equated with the necessary justifiable reliance.

When the Bank in January 1978 denied the Jewells' request for long-term (construction) financing on the O'Connell plant, they went elsewhere (to PCA). Certainly, the Jewells were aware there could be no assurance that any of their requests to the Bank for long-term financing would be granted.

Moreover, George M. Jewell knew of Sullivan's limited lending authority and that his request for such a large loan required the approval of Sullivan's superiors. Obviously, knowledge that the loan request required such approval implies an awareness that any such request could be denied. ▮ It follows, inescapably, that Jewell could not have reasonably relied on the Bank's failure to disclose that the loan might be denied.[10]

▮ The Jewells seek to support a finding of reliance by pointing to Jensen's April 1979 site visit and saccharine comments which, they claim, lulled them into a false sense of security and created an obligation in Jensen to dispel any illusion that the loan would be forthcoming.

Yet by April 1979, construction on the O'Connell plant was nearly completed. Given the Bank's earlier refusal to finance the O'Connell plant and the Jewells subsequent recourse to the seven-year loan obtained from PCA, the Jewells' assertion—that they would have avoided any financial entanglement in the O'Connell construction had they known long-term financing might be denied—cannot be logically accepted. Indeed, actual construction of the dehydrating plant began in May 1978, notwithstanding the fact that long-term financing had not yet been procured.

The Jewells further claim they reasonably believed an "oral" commitment had been made, especially in light of the Bank's prior oral commitments to the Co-op and to George R. Jewell, followed up with long-term (take-out) loans. But there is no evidence the Jewells even knew of the oral

---

[10] As one of its claims of error, the Bank underscores the trial court's effective deletion of the requirement of justifiable reliance in the jury instruction given, viz.: "Where there is a fiduciary relationship, the one to whom the fiduciary relationship is owed has the right to rely on the representation made to him by the fiduciary without the duty of further inquiry."

We agree that this instruction erroneously permitted the jury to find fraud even though George M. Jewell knew Sullivan lacked authority to commit to long-term financing. The correct rule charges the beneficiary of a fiduciary relationship with investigating facts of which he has actual notice. (*Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177]; *Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 131, fn. 12 [125 Cal.Rptr. 59].)

commitment made to the Co-op. And the financing on the fresh pack plant occurred in October 1979, *after* the Jewells were informed a long-term loan on the O'Connell plant would not be made.[11]

### (3) *Jewells' Ranch Loan*

■ The Jewells further posit their claim of fraudulent inducement to engage in short-term borrowing on the Bank's alleged promise to make a long-term loan secured by the Jewells' ranch, if ever necessary. They construct their ancillary claim largely on statements made by Sullivan to George M. Jewell assuring such possibility, first in August 1977, when George M. Jewell borrowed $150,000 from the Bank to pay off the O'Connell Company's old bank debt; and again in December 1977, when the two men were discussing the probable terms of a long-term loan on the O'Connell plant.

Assuming the substance of Sullivan's statements could arguably be construed as positive assurances, again we find the evidence of justifiable reliance wholly insufficient. When discussions resumed in 1978 concerning long-term financing for the O'Connell plant, Sullivan openly suggested the use of the ranch as security. George M. Jewell *refused,* saying he did not owe the apple industry that much. In 1980, when Bunch arranged the consolidated $850,000 four-year loan, Bunch made a similar suggestion which the Jewells rejected because that loan was not the long-term loan they desired. Finally, at the time a short-term loan was arranged for the Jewells to pay their growers, Bunch discussed the possibility of taking the Jewell ranch for collateral and was again met with an emphatic "no." George M. Jewell's persistent refusal to encumber the Jewell ranch belies the claim now asserted that the Jewells would not have undertaken the initial borrowing if they had known they could not thereafter obtain new financing secured by the ranch.

Moreover, it is clear from the record that it was not until 1980, *after* the Bank cut off any more unsecured loans, that the Jewells attempted to obtain a real estate loan on the Jewell Ranch. By then, of course, their circumstances had changed dramatically. By the end of 1977, the Jewells' only outstanding indebtedness to the Bank was the $150,000 loan used to pay off

---

[11] Nor could it be argued that the Bank's silence deterred the Jewells from seeking financing alternatives. As noted, in August 1979, Sullivan told George M. Jewell the Bank would not grant a long-term loan. But it was not until a year later (October 1980) that the Jewells began to investigate alternative resources for the required financing. By then, their negotiating position was considerably weakened: they had lost their security, their deeds of trust on the O'Connell properties having been assigned to the Bank in connection with the $850,000 loan to George M. Jewell, and the Jewells had also signed the nonencumbrance agreement thereby effectively eliminating their ranch property as loan collateral.

the O'Connell Company's bank loan. By 1980, in marked contrast, the Jewells' financial outlook was bleak indeed: not only did they owe the Bank over $1.3 million, they also owed PCA $1 million and their apple growers $985,000. As of January 1980, the Jewell Ranch was valued at $1,337,000.[12]

Obviously, by that time, the Bank had decided it was not willing to lend any more funds to the Jewells. The Jewells could not reasonably have expected that the Bank's promise or assurances of a loan secured by the Jewell Ranch would extend indefinitely, notwithstanding such a staggering debt picture.

### B. *Denial of Long-term Financing*

 The Jewells' principal grievance against the Bank is its refusal to come to their financial rescue by providing long-term financing. The Bank's failure to do so, they strongly argue, constituted a bad faith denial of a contract. This theory of liability is equally devoid of supporting evidence in the record before us.

Tort liability based on bad faith denial of a contract was first recognized in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158]. Our highest court, while reiterating established principles governing a breach of the covenant of good faith and fair dealing in the context of a contract remedy, declined to rule on the question whether such breach gave rise to a tort action in the context of an ordinary commercial contract.[13] Instead, the court fashioned a distinctly different form of relief: "a party to a contract may incur tort remedies when, *in addition to breaching the contract,* it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists." (36 Cal.3d at p. 769, italics added.)

 Thus, the cause of action in tort arises when the party not only breaches the contract but also denies in bad faith that a contract even exists. The inherent precondition to such a tort claim is the existence and breach of an enforceable contract. (See *Palmer* v. *Ted Stevens Honda, Inc.* (1987) 193 Cal.App.3d 530, 538-539 [238 Cal.Rptr. 363]; *Malmstrom* v. *Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 321 [231 Cal.Rptr. 820].)

---

[12] The Jewells also owned equipment and inventory, giving them a net worth of $4 million. But the value of their real estate did not approach the level of their indebtedness.

[13] More recently, the Supreme Court has declared that "not every breach of the covenant of good faith and fair dealing in a commercial contract gives rise to an action in tort." (*Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 497, fn. 11 [220 Cal.Rptr. 818, 709 P.2d 837].)

In *Seaman's,* there was no question that a valid (dealership) contract had been formed. The pivotal circumstance underlying the tortious conduct was the *"contracting* party seeking to avoid all liability *on a meritorious contract claim* by adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics." (36 Cal.3d at pp. 769-770, italics added.)

In the subsequent cases applying *Seaman's,* the formation of a contractual relationship was *not* in dispute; rather, tort liability, where found, was based on the bad faith assertion of an invalid defense by the party in breach. (See, e.g., *Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d 511 [statute of limitations asserted by bank against checking account holder]; *Rulon-Miller* v. *International Business Machines Corp.* (1984) 162 Cal.App.3d 241 [208 Cal.Rptr. 524] [false grounds asserted by employer for wrongful discharge of employee].)

But the rule announced in *Seaman's,* explicated in its progeny, is not applicable here. There was no contract, oral or written, between the Bank and the Jewells providing for long-term financing. Nor, indeed, have the Jewells alleged a cause of action for breach of contract by the Bank. Instead, they seek to impose tort liability on the Bank through the bare allegation of a bad faith *denial* of a contract. Neither the allegation nor its proof comes within the *Seaman's* contours of tort liability.

The jury was correctly instructed, and obviously found, that an underlying contract was a prerequisite to recovery. But the jury's special finding of liability on the asserted theory of bad faith denial of a contract is wholly unsupported in the record. To bolster their claim that the Bank was "committed" to a long-term loan on the O'Connell plant, the Jewells point to the following circumstances: the Bank granted them the equipment loan for the plant, which under ordinary bank practices would presuppose the extension of long-term financing; Jensen's favorable comments during his April 1979 site visit and his reported urging of long-term financing; Sullivan's stated intention (to his superiors) to make a "RE loan for packing shed, dehydrator, etc.," coupled with the later appraisal request informing regional officials that the proposed O'Connell loan proceeds would repay the Jewells enabling them to discharge their debts to the Bank and PCA; and, lastly, statements in the Jewells' credit reports that the unsecured short-term loans would be repaid by "financing of real estate" or "RE loan for packing shed, dehydrator, etc."[14]

---

[14] Over the Bank's objection, the trial court permitted expert testimony that Sullivan's actions and the Bank's conduct gave rise, inter alia, to an implied commitment of long-term financing. The Bank renews the objection on appeal, strongly contending that the irrelevant

However, the Bank points out, correctly we believe, that the circumstances and events highlighted provide no basis to establish that a binding agreement was formed.

█ It is, of course, elemental that creation of a valid contract requires mutual assent ordinarily evidenced by an offer and acceptance. (See generally Civ. Code, §§ 1550, 1565; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 128, p. 153.) Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement. "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." (Rest.2d Contracts, § 26, p. 75.)

As the distinguished commentator explains: "When the evidence clearly shows . . . that the only (and the complete) subject matter that is under consideration is left for further negotiation and agreement, there is no contract, not for vagueness or indefiniteness of terms but for lack of any terms." (Corbin on Contracts, § 95, p. 397.)

█ Here, the entire subject matter under consideration—the long-term loan—was at best left open to future negotiations and agreement. George M. Jewell, fully aware of Sullivan's limited lending authority, was informed that Sullivan was "working on" obtaining the necessary approval from his superiors.[15] The Jewells' hopeful expectation that a loan agreement would eventually be reached was simply that: an expectation. The Bank's manifestation of assent never materialized; and no agreement was ever formed. Under such circumstances, the Bank was under no legal obligation or commitment to make a long-term loan.

Nor can the credit report (CR-115) submitted by the local branch in October 1979 be transformed into a contract, as contended.[16] That report was submitted without the Jewells' knowledge well after Sullivan notified the Jewells that no loan was forthcoming. Clearly, the unilateral submission under such circumstances could not constitute a mutual agreement between the parties on the terms and conditions proposed in that document.

---

opinions of law prejudicially tainted the validity of the jury verdicts. In view of our determination (*post*), we need not discuss the questionable ruling.

[15] The fallacy of the reasoning advanced by the Jewells is inherent in their unjustified assumption that Sullivan's repeated assurances that things would be "worked out" constituted a binding loan commitment. However, as previously discussed, assurances to work things out amount to no more than promises to continue negotiations looking to a future agreement.

[16] In October 1979, a local branch official submitted a CR-115 to the regional credit office seeking approval of a $1.9 million O'Connell loan. The Jewells were unaware of this action. The loan was never approved, and the CR-115 was eventually returned to the local branch.

The related theory that an agreement existed to extend financing on the Jewell ranch finds even less support in the record. There is a complete lacuna in the proof of essential terms of the claimed loan agreement: namely, the amount of the loan, the rate of interest, the terms of repayment, applicable loan fees and charges. The suggestion that terms similar to those contained in the 1979 credit report would apply on the ranch loan is both illogical and unreasonable. First, the proposed O'Connell plant loan was to provide long-term refinancing of the short-term construction loans; in contrast, the ranch loan discussions focused on the future "needs," if any, of the Jewells. As noted, by 1980, the Jewells were seriously overextended with the Bank, their growers and PCA. Yet no specific financial needs, loan amount or relevant terms were ever discussed. Moreover, George M. Jewell had indicated unequivocally on at least two earlier occasions that the ranch would not be used as security for a bank loan. Quite clearly, there is no competent evidence of the essential ingredients of a binding agreement to make a long-term loan secured by the ranch itself.

Inevitably, we must conclude the Jewells' reliance on a tort theory of bad faith *denial* of a contract to support the judgment is wholly misplaced. Such a theory of relief is unavailable where, as here, no underlying agreement exists. Without proof of an underlying agreement, tort liability may not be imposed on the Bank for its failure to provide long-term financing to the O'Connells or to the Jewells.

### C.

#### *Failure to Distribute Assets*

Relying on similar theories of fraud and bad faith denial of a contract, the Jewells contend that the Bank's failure to apply the satellite parcels' sales proceeds to the debt owed their growers or PCA, as promised by Bunch, rendered the Bank liable in damages. Had the Jewells known the Bank would ultimately refuse to honor its commitment to repay their creditors, it is argued, the Jewells would never have agreed to assign trust deeds on their properties in the Bank's favor.

It is axiomatic that to obtain a recovery for fraud, a claimant must prove, inter alia, that damages were sustained as a proximate cause of the fraudulent conduct. (Prosser & Keeton, Law of Torts, *supra,* § 110, p. 767.) Assuming, arguendo, a claimant's reliance on the actionable misrepresentation, no liability attaches if the damages sustained were otherwise inevitable or due to unrelated causes. (Harper et al., The Law of Torts (2d ed. 1986) § 7.13, p. 465; see also *Bezaire* v. *Fidelity & Deposit Co.* (1970) 12

Cal.App.3d 888, 892-893 [91 Cal.Rptr. 142].) The absence of the necessary element of causation, we conclude, is fatal to the Jewells' claim.

Even if Bunch's promise were false and fraudulent, the property loss sustained by the Jewells was not the product of Bunch's false promise but was the direct result of their self-created indebtedness. Put differently, even had they not assigned the trust deeds, their property would still have been subject to the satisfaction of the existing claims of their creditors.

Moreover, had the Bank distributed the proceeds to PCA and the growers, undoubtedly such distribution would have been successfully challenged by the bankruptcy trustee as an illegal preferential distribution. (See 11 U.S.C. § 547(b).) As it happened, the trust deeds and sales proceeds were eventually turned over to the bankruptcy trustee as part of the estate to be administered for the benefit of creditors. Thus, PCA and the growers stand in no less favorable position than if the Bank had made a voidable preferential distribution to them.

Understandably, the Jewells complain of the damages occasioned by the Bank's nearly three-year delay in turning over the assets to the trustee-in-bankruptcy.[17]

But the appropriate forum to seek recovery of damages in the form of attorney fees (as costs against the Bank) was the bankruptcy proceeding itself. Once a bankruptcy action is commenced, the bankruptcy court has exclusive jurisdiction over the debtor's property. (28 U.S.C. § 1334(d), formerly § 1471(e).) Thus, it is within the exclusive jurisdiction of the bankruptcy court to recover or restore assets belonging to the estate. (1 Cowans, Bankruptcy Law and Practice (1987) § 1.2(k), pp. 33-34; 9 Am.Jur.2d, Bankruptcy, §§ 487-489, pp. 793-797.) As part of such action, the trustee may also recover prejudgment interest, costs, attorney fees and damages for loss of use of the property. (Bankruptcy Rule 7054.) Because the damages here asserted—attorney fees incurred due to the Bank's intransigence—were recoverable in the bankruptcy proceeding, the Jewells cannot now split their cause of action in an attempt to recover them in this lawsuit. (See *Hatch* v. *Bank of America* (1960) 182 Cal.App.2d 206, 210 [5 Cal.Rptr. 875] [plaintiff cannot maintain a second action for damages (loss of use) following quiet title and possession action].)

Our analysis herein of the Jewells' fraud claim applies with equal force to the tandem claim of bad faith denial of a contract. Though the Jewells

---

[17]Apparently, the "turn-over" order required years of litigation and substantial costs in attorney fees.

characterize their action in terms of a tort action, the gravamen of the claim asserted is a *breach* of contract. But even so considered, no merit is discerned: the Bank ultimately, though belatedly, performed in turning over the assets to the Jewells' legal representative, the trustee-in-bankruptcy. However, as already determined, the attorney fees and costs incurred in effecting the involuntary transfer are not recoverable in this subsequent action.

\* \* \* \* \* \*

In conclusion, we hold that on the record before us the Jewells have failed to prove the Bank's liability in damages on the basis of fraud or bad faith denial of a contract. Accordingly, the jury's verdicts for compensatory damages cannot stand. ■■■ And since the claims for punitive damages are mere incidents to the causes of action and cannot constitute the basis thereof (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801-802 [197 P.2d 713]; *Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 391 [196 Cal.Rptr. 117]), the respective awards for such damages must be similarly vacated and set aside.

## II. Kruse Complaint

Mrs. Kruse's claim against the Bank was based solely on the Bank's conduct which contributed to her decision to transfer her controlling stock interest in the O'Connell Company to the Jewell family in 1979. The theory advanced at trial was that the Bank fraudulently induced Mrs. Kruse to execute the transfer of stock by misrepresenting to Mrs. Kruse that long-term financing would then be provided. Mrs. Kruse was allegedly injured by the stock transfer because by relinquishing control of her company to the Jewells, she was thereby prevented from obtaining a long-term loan elsewhere.[18] The jury awarded Mrs. Kruse $2,770,000 in compensatory damages: $2,670,000 on alternate theories of fraud and intentional interference with prospective business advantage and $100,000 for emotional distress. The jury also awarded $6,675,000 in punitive damages. We find the verdict likewise unsupported by the evidence in the record.

### A.

### *Fraud*

In order to uphold the verdict on the grounds of fraud, it must be shown by the evidence that the plaintiff changed her position in justified reliance

---

[18] Mrs. Kruse argued below that the Bank's improper conduct was motivated by a desire to destroy the O'Connell Company, a competitor of the Co-op for the supply of available apples. It is noteworthy that on the Bank's motion for new trial, however, the trial court found "the evidence is not sufficient to show that the wrongful conduct of the defendant was motivated by a corporate plan or scheme to put the parties out of business."

on the fraudulent misrepresentation resulting in damage. (Civ. Code, § 1709; 4 Witkin, Summary of Cal. Law, Torts, *supra*, at § 479, p. 2738; see also 37 Am.Jur.2d, Fraud and Deceit, § 223, pp. 297-299.) The change of position herein was the stock transfer upon the mistaken expectation that a long-term loan would be given. Mrs. Kruse was entitled, of course, to rescind the stock transfer when the long-term financing did not materialize. (Civ. Code, § 1689.) And a claim for rescission against the Jewells was initially pursued. However, by the time of trial, she had abandoned her claims against the Jewells for the now worthless stock.

 Mrs. Kruse claimed two species of damages against the Bank as a result of the stock transfer: 1) the difference between the fair market value of her stock ($490,393) and the amount she received for it ($180); and 2) anticipated profits of the O'Connell Company, payable as dividends, which were lost because the O'Connell Company failed to receive the expected long-term loan. On appeal she reiterates her claim of damage by virtue of the "loss of the fair market value of the stock at the time it was pledged to the Jewells and the returns which it would have generated had the long-term financing been provided."

As to the diminished value theory of damages, the Bank correctly points out that it played no part in setting the price paid for the stock and any resulting loss of value. The nominal $180 payment by George R. Jewell was determined in the course of negotiations on January 7, 1979, between George M. Jewell, Mrs. Kruse and her son, Dan O'Connell. It is reasonable to conclude that Mrs. Kruse acquiesced in the nominal sum fixed with the expectation of facilitating repurchase at some future time. The price paid for the stock was totally independent of the asserted misrepresentations by the Bank. We are furnished no evidence from the record supporting a finding of a causal connection between the alleged damages and the Bank's fraudulent conduct.

It seems obvious that Mrs. Kruse's central complaint is not the Bank's fraudulent inducement but rather the Bank's refusal to provide long-term financing for the O'Connell Company. Indeed, her brief explains her position that she was damaged "not as the Bank asserts because of the nominal price of $180, but because the Bank repudiated its commitment to fund a long-term loan. . . . [¶] . . . Had the Bank lived up to its promise [of long-term financing], Mrs. Kruse would not have been damaged."

Yet, contrary to her assertions, the record contains no evidence of a "commitment" or "promise" to make such long-term loan. Unlike the Jewells, at trial Mrs. Kruse conceded there was *no contract* to lend money, since *no terms had been negotiated*. The thrust of her argument is directed

to the Bank's conduct in 1977 and 1978 as the basis of an implied representation that the Bank would fund a long-term loan when in fact it had no intention to do so. The argument falls under its own weight, the record reflecting an absence of any substantial evidence supporting either an implied promise to lend money or the essential requirement of justifiable reliance.

At most, Sullivan expressed interest in securing the desired financing. As previously discussed, he and George M. Jewell engaged in ongoing discussions and negotiations for the purpose of obtaining the necessary loan approval from Sullivan's superiors, a prospect long incubating within George M. Jewell's hopeful expectation, an optimism he quickly shared with Mrs. Kruse and her son. Yet, George M. Jewell's optimism was unfounded. He knew that Sullivan lacked authority to approve the sizable loan necessary to fund the dehydration plant. The very premise of their frequent discussions was the need to obtain the approval of the regional office. In fact, the stock transfer in response to Sullivan's request was purportedly a step towards facilitating the needed approval. It is indisputable that the regional office's approval was recognized by both the Jewells and the O'Connells as a condition precedent to the Bank's expected commitment to extend long-term financing. The evidence of such contingent expectations and negotiations is far removed from a binding promise to lend money and also negates any reasonable reliance upon the Bank's alleged misrepresentations.

Moreover, the argument advanced is fatally defective for other reasons. We note that Mrs. Kruse's position is in polar opposition to that advanced by the Jewells. Mrs. Kruse claims that the Bank was bent on bankrupting the O'Connell enterprise in order to save the Co-op, the Bank's largest customer; that in furtherance of that design, the Bank secretly never intended to provide the needed financing to the O'Connell Company; and that the assurances given to George M. Jewell were knowingly false and calculated to deceive him. The Jewells, on the other hand, claim the Bank wanted the O'Connell Company to survive economically and used the Jewells as a vehicle to accomplish that goal. (Part I. A., *ante*.) The Jewells argue that the Bank was fully committed to providing the financing but then later repudiated its commitment. (Part I. B., *ante*.)

Thus, the jury's findings in favor of both Mrs. Kruse and the Jewells appear to be internally inconsistent and mutually exclusive: if the jury found that the Bank entered into an enforceable contract with the Jewells to provide financing for the O'Connell Company, then logically it could not also find that the Bank officials gave false assurances to Mrs. Kruse. Conversely, if the jury found the Bank falsely promised Mrs. Kruse to fund the long-term loan, it could not have simultaneously found that the Bank had

actually agreed to make the loan. Such a material inconsistency in the jury's verdicts alone mandates reversal of the judgment.

But, in any event, even if we were to view the Bank's statements and conduct as rising to the level of an enforceable promise to lend money, no competent evidence is shown of any causal connection between the change of position by Mrs. Kruse and her claimed damages. Her assertion that the Bank's "prolonged deceit" inducing her stock transfer "led to the financial ruin of them all" is nonsense. The stock transfer in no way imaginable caused the collapse of the O'Connell Company or, for that matter, the Jewells' own dire circumstances.

■■ The damage which resulted from the lack of financing was the termination of the O'Connell Company's apple processing business, and that damage was to the *corporation,* not to Mrs. Kruse individually. The trial court properly precluded Mrs. Kruse from recovering damages for any injury to the corporation, as she lacks standing to recover for injuries to the company itself.[19] (*Sutter* v. *General Petroleum Corp.* (1946) 28 Cal.2d 525, 530 [170 P.2d 898, 167 A.L.R. 271]; see also *Jones* v. *H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 106-107 [81 Cal.Rptr. 592, 460 P.2d 464]; *Smith* v. *Tele-Communication, Inc.* (1982) 134 Cal.App.3d 338, 342-343 [184 Cal.Rptr. 571].)

■■ We conclude that there is no evidence of a substantial nature that either the transfer of stock or the attendant change of position by Mrs. Kruse was a proximate cause of her financial loss.

## B.

### Interference with Economic Advantage

■■ Mrs. Kruse's claim of intentional interference with prospective economic advantage, while not well formulated, rests on a theory that the Bank's refusal to provide long-term financing and its efforts to liquidate the O'Connell Company destructively interfered with the relationship between Mrs. Kruse and the corporation. But the theory asserted amounts to nothing more than an indirect attempt to assert damages to the corporation which Mrs. Kruse lacked standing to do. (*Sutter* v. *General Petroleum Corp., supra,* 28 Cal.2d at p. 530.)

In her brief, she declares that the interference occurred "when the Bank induced plaintiff to pledge her stock to the Jewell family by promising that

---

[19] Parenthetically, we have taken judicial notice that the trustee-in-bankruptcy has filed a lawsuit in federal court against the Bank seeking damages in behalf of the corporate entity, the O'Connell Company.

it would finance the O'Connell project . . . . [which it] refused to do . . . leaving [her] powerless to regain control of her company."

To the extent that the argued interference was directed to the unkept promise of long-term financing, Mrs. Kruse failed to establish a cause of action. The tort of intentional interference with economic advantage affords a remedy for wrongful interference with an economic relationship by a *third party*. (*Dryden* v. *Tri-Valley Growers* (1977) 65 Cal.App.3d 990, 998-999 [135 Cal.Rptr. 720]; *Kelly* v. *General Telephone Co.* (1982) 136 Cal.App.3d 278, 288 [186 Cal.Rptr. 184]; see also Prosser & Keeton, The Law of Torts, *supra*, § 129, p. 978; Rest.2d Torts, § 766.) Here, however, only two parties were involved: the O'Connell Company, anxiously hoping for the bank loan, and the Bank itself which, through a convoluted reasoning process, is charged with interference by denying the loan.

The presence of the Jewells does not fulfill the third-party requirement. In the context presented, the Bank's alleged promise was to provide long-term financing directly to the O'Connell Company, *not* to the Jewells. And, at the risk of repetition, it bears emphasis that George M. Jewell consistently rejected any suggestion to obtain financing by encumbering the ranch.

While wrongful interference with one's *own* business may arguably constitute a breach of contract, it cannot serve as the basis of the claimed tort liability. Indeed, interference with business relations is ordinarily privileged if one has a financial interest in one of the parties. (*Culcal Stylco, Inc.* v. *Vornado* (1972) 26 Cal.App.3d 879, 882 [103 Cal.Rptr. 419]; Rest.2d Torts, § 769.) The Bank's refusal to extend long-term financing to the O'Connell Company, even if that refusal amounted to an outright repudiation of a firm commitment, does not give rise to tort liability for interference with an economic advantage. Mrs. Kruse alternatively claims the Bank wrongfully interfered with the relationship between the O'Connell Company and George R. Jewell, its majority shareholder. She theorizes that by denying the long-term loan, the Bank prevented the corporation from paying its indebtedness to the Jewells forcing the latter to liquidate the corporation. The trial court, as noted, correctly determined that Mrs. Kruse could not seek recovery of damages for any injury to the corporation by reason of her lack of standing to do so. (*Sutter* v. *General Petroleum Corp., supra*, 28 Cal.2d 525.) The claim lacks merit.

## C.

### Emotional Distress

■ The jury awarded Mrs. Kruse $100,000 in damages for intentional infliction of emotional distress. Yet, the precise legal basis supporting the

claim eludes comprehension. Mrs. Kruse argues that the Bank's liability arises from its deliberate conduct with the knowledge she lived on property owned by the O'Connell Company whose bankruptcy would subject her to the threat of being evicted and homeless. But the nature of the Bank's misconduct upon which the admittedly sympathetic plaint is grounded remains unclear.

Insofar as the claim for emotional distress is based on the same conduct alleged to show fraud, no recovery is permitted. Emotional distress is not recoverable as an element of damages for fraud. (*Channell* v. *Anthony* (1976) 58 Cal.App.3d 290, 315 [129 Cal.Rptr. 704]; *O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147, 159 [119 Cal.Rptr. 245].)

Insofar as the claim is directed to the Bank's efforts to liquidate the O'Connell properties, the conduct was privileged. A party is not subject to liability for infliction of emotional distress when it has merely pursued its own economic interests and properly asserted its legal rights. (See *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 395 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; see also Rest.2d Torts, § 46, com. g, p. 76.)

Here, the Bank's interest in liquidating the O'Connell properties was an act of economic self-interest. The trust deeds on the O'Connell properties had been assigned to the Bank by the Jewells. Without liquidating the O'Connell properties, the Jewells would have been unable to repay the debts owed by them to the Bank.

Of course, the Bank's actions in its own interest are circumscribed in scope and may not be undertaken in an impermissible manner. (See *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376.) But there is no cognizable showing that the Bank acted in an illegal or impermissible fashion. There were no threats or words of abuse directed toward the plaintiff. (Cf. *Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 908-909 [215 Cal.Rptr. 679, 701 P.2d 826] [public ridicule and use of profanities]; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216] [racial insult and wrongful discharge]; *Golden* v. *Dungan* (1971) 20 Cal.App.3d 295 [97 Cal.Rptr. 577] [midnight visits by process server]; *Bundren* v. *Superior Court* (1983) 145 Cal.App.3d 784 [193 Cal.Rptr. 671] [demands for payment while plaintiff lay in hospital bed].) In fact, Mrs. Kruse had no contact with the Bank and its officials, directly or otherwise. The Bank's "conduct" consisted of statements by Bunch made to *others*: to George M. Jewell urging liquidation proceedings and to Dan O'Connell and

his sister pointing out the need to sell the O'Connell properties.[20] While Bunch's heartless and insensitive remarks merit opprobrium, they do not qualify as the kind of "outrageous" conduct necessary to support an action for intentional infliction of emotional distress.[21] (See, e.g., *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197 [185 Cal.Rptr. 252, 649 P.2d 894]; *Cortez* v. *Macias* (1980) 110 Cal.App.3d 640 [167 Cal.Rptr. 905].)

\* \* \* \* \* \*

In summary, we conclude that Mrs. Kruse has failed to establish by substantial evidence that the Bank was in any manner legally responsible for her tragic plight. Accordingly, the judgment in her favor based upon a verdict of fraud, interference with economic advantage or infliction of emotional distress must be reversed.

In view of our dispositive determinations in the matters before us, we need not discuss the remaining issues raised on appeal.

The judgments, and each of them, are reversed. The cross-appeals are dismissed as moot. Costs are awarded to the Bank.

Elkington, J., and Newsom, J., concurred.

Petitions for a rehearing were denied June 17, 1988, and the petitions of plaintiff and appellant and cross-complainants and appellants for review by the Supreme Court were denied September 1, 1988. Lucas, C. J., and Panelli, J., did not participate therein.

---

[20] When a question arose whether Don O'Connell's sister, a licensed real estate broker, should act as broker in the liquidation sale, Bunch bluntly questioned her "guts" to sell her mother's house.

[21] Testimony that Bank officials knew as early as 1974 that an execution sale of her home would be "upsetting" possessed little relevance as to whether the now challenged conduct was outrageous in legal contemplation. Perhaps all that can be said is that the axis of the financial world turns more on economic reality than human compassion.