**OKURA & CO. (AMERICA), INC., a New York corporation, Plaintiff,**

v.

**The CAREAU GROUP, dba Julius Goldman's Egg City, a California corporation; Richard F. Carrott, an individual; Marie Antoinette Carrott, an individual; Commonwealth Land Title Insurance Company, a Pennsylvania Corporation, Defendants,**

**And Related Counterclaims.**

**No. CV 90–0542 SVW.**

United States District Court, C.D. California.

Aug. 16, 1991.

---

counterclaim defendant Okura & Co., Ltd., a Japanese corporation, and counterclaimants and counterclaim defendants Kiyotsugu Kobori and Shiro Asakawa.

A. Barry Cappello, Frances E. Komoroske and Michael W. McCann, Cappello & Foley, Santa Barbara, Cal., for defendants, counterclaimants, and counter-defendants The Careau Group, Richard F. Carrott and Marie Antoinette Carrott.

## MEMORANDUM OF DECISION AND ORDER; ORDER RE DIRECTED VERDICTS AND SANCTIONS; AND ORDER RE JURY TRIAL WAIVER

WILSON, District Judge.

### INTRODUCTION

This action was tried to the court during various parts of November and December of 1990. At the conclusion of the trial, the court informed the parties that it would issue an order framing the issues for the parties so that they could submit proposed findings of fact and conclusions of law responsive to the court's concerns. The parties submitted their proposed findings and supporting memoranda in late February, 1991. This memorandum of decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Additionally, this memorandum of decision will address the court's finding that the defendants had contractually waived a jury trial on their counterclaims, the question of whether defendant's counsel should be sanctioned, and the basis for the court's directed verdict against the defendants on several of their counterclaims.

Briefly, this litigation arises out of dispute over the proper characterization of the financial infusions made by plaintiff Okura–America into defendants' business, Egg City, to take it out of bankruptcy and whether the parties fulfilled their duties to each other. Plaintiff instituted this litigation seeking a judicial declaration that defendant The Careau Group dba Julius Goldman's Egg City ("Careau") had defaulted on approximately thirty million dollars

R.D. Kirwan, James A. Magee and Madelene P. Vanderford, Pillsbury, Madison & Sutro, Los Angeles, Cal., for plaintiff and counterclaim defendant Okura & Co. (America), Inc., a New York corporation,

worth of debt owed to the plaintiff and that defendants Richard Carrott ("Carrott") and Marie Antoinette Carrott ("Mrs. Carrott") were personally liable as guarantors for all or some of that debt. Defendants counterclaimed against Okura–America, its parent corporation, Okura–Japan, and two Okura officers, Messrs. Asakawa and Kobori, claiming, *inter alia*, that they had defrauded the defendants into agreeing to the form of the financing selected by the plaintiff, that the Okura entities and Asakawa and Kobori breached fiduciary duties owed to the defendants as partners or directors of defendant Careau, and that, even if Okura was only a creditor of Careau, it exercised undue control over the defendant and rendered defendant unable to repay the loan. Defendants also named Q.P. Corporation, a Japanese corporation, and its American subsidiary, Q & B, Inc., as defendants to their counterclaims. However, the court severed the defendants' claims against Q.P. and Q & B. Additionally, Messrs. Asakawa and Kobori counterclaimed against defendants Careau and Carrott for invasion of privacy.

## DISCUSSION

### I. WAIVER OF RIGHT TO JURY TRIAL.

■ Prior to trial, plaintiff brought a motion to strike the defendants' demand for jury trial on both the plaintiff's claims and the defendants' counterclaims. The basis for plaintiff's motion was that defendants had waived their rights to jury trial in provisions in the parties' financing agreement, the promissory notes, and the individual defendants' personal guaranties. After holding an evidentiary hearing over several days in August, 1990, the court ruled that the jury waiver provisions were valid. Subsequently, the court found that the waiver encompassed all of the claims in this action and, thus, granted the motion to strike the jury demand in full. The court rejected Careau's contentions that the jury waiver should be construed strictly against finding a waiver on its counterclaims against Okura–Japan and Messrs. Asakawa and Kobori.

Specifically, a provision of the agreement executed by plaintiff Okura–America, as "Lender," and defendant Careau, as "The Company," on December 18, 1987 provides:

> Section 7.10. *Waiver of Trial by Jury.* The Lender and the Company hereby irrevocably waive all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or any of the Operative Agreements or the actions of the Lender in the enforcement thereof.

Trial Exhibit ("Tr. Exh.") No. 256. Additionally, both Richard Carrott and Marie Antoinette Carrott signed personal guaranties for the debts incurred by Careau that provided:

> The Guarantor and the lender, by its acceptance of this Guaranty, consent to the personal jurisdiction of the state or federal courts located in the City or County of Los Angeles, and hereby waive their right to trial by jury on any suit, action or proceeding brought to enforce this Guaranty.

Further, each of the Promissory Notes executed by Careau included the following: "The undersigned waives, to the fullest extent permitted by law, any right it has to a jury trial."

■ While the right to civil jury trial is a fundamental constitutional right, it may be waived by a contract knowingly and voluntarily executed. *Leasing Service Corp. v. Crane,* 804 F.2d 828, 832–33 (4th Cir.1986). Also, a mere failure to demand a jury trial within ten days of filing a pleading containing issues for which a jury is desired results in waiver of the right to jury trial on those issues. Fed.R.Civ.P. 38(b), (d). As Professor Moore's treatise notes, there is no abstract public policy against contractual waivers of the right to civil jury trial. J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* para. 38.46 (2d ed. 1985). In the present case, the court's conclusion that the jury waiver was valid was based on its finding that Richard Carrott on behalf of himself and The Careau Group knowingly, voluntarily, and intelligently waived any right to jury trial regarding disputes arising out of the parties' financ-

ing agreement. *See Leasing Service Corp.*, 804 F.2d at 832–33. Specifically, the court found that the jury waiver provisions had been negotiated by the parties and were an essential aspect of the parties' bargain. Additionally, the court notes that the waiver signed by Marie Antoinette Carrott was also entered into knowingly, voluntarily, and intelligently. While Mrs. Carrott was not involved in the negotiations of the financing arrangement between Careau and Okura–America, she was aware of the need for her personal guaranty of the debts to be incurred by Careau and, with that knowledge, she accepted the terms of the personal guaranty including its jury trial waiver. Thus, the court found that the jury waiver provisions contained in the various documents were valid.

■ Having found that the waiver provisions were valid and enforceable, the court had to determine the scope of the jury waiver. With regard to the plaintiff's first amended complaint, the first through seventh and fifteenth through twentieth causes of action seek enforcement of the agreements, notes, and guaranties that contain the waivers or are related to the December 1987 agreement. Additionally, the claims for judicial foreclosure and specific performance would not, in any event, give rise to a right to jury trial. The plaintiff's thirteenth cause of action is for breach of a letter agreement regarding compensation for the services of Messrs. Asakawa and Kobori. Since Asakawa and Kobori provided services to and acted as directors of Careau pursuant to a provision in the December 1987 financing agreement, that cause of action is related to the December 1987 agreement and, thus, is within the jury waiver. However, the plaintiff's eighth through twelfth causes of action for breach of the grain purchase agreement and common counts arising from the grain purchases by Okura for Careau present a more difficult question. The grain purchase agreement is an independent contract that does not contain a jury trial waiver. Thus, if defendants presented a genuine triable issue of fact, they were entitled to a jury trial on plaintiff's claims concerning the grain purchases. The plaintiff's four-

teenth cause of action is for breach of an oral contract requiring Careau to reimburse Okura for certain shipping costs. However, that contract was allegedly entered into in mid–1986 and, hence, predates the documents containing the jury waiver provisions. Thus, it appears that defendants were entitled to a jury trial on any genuine issues of fact presented regarding the oral reimbursement agreement.

■ Further, while it was clear to the court that the jury waivers applied to defendants' counterclaims against Okura–America, the defendants argued that the waivers were not applicable to their counterclaims against Okura–Japan, Messrs. Asakawa and Kobori, Q.P., and Q & B, since only Okura–America was a party to the financing agreement and notes and a beneficiary of the personal guaranties. The court disagreed. The waiver contained in the body of the agreement between Careau and Okura–America provides that the parties waive jury as to "any action, proceeding or counterclaim arising out of or relating to this Agreement or any of the Operative Agreements or the actions of the Lender in the enforcement thereof." Tr. Exh. No. 256. Careau's essential contention is that the Okura entities defrauded it into agreeing to the financing arrangement with the goal of forcing Careau into default so that plaintiff could assume control of Egg City. Further, Careau contends that plaintiff failed to keep promises about continued financing and took other actions that disabled Careau, thereby making it impossible for it to meet its obligations. Additionally, the basis for Careau's claims against Okura–Japan is that it is the alter ego of its subsidiary, Okura–America. Thus, it appears that all of the claims made by the Careau, whether denominated as counterclaims or third party claims, either relate to the financing arrangement itself or derive from duties allegedly created by the December 1987 agreement.

Specifically, the first, second, and fifth causes of action in the first amended counterclaim allege that the parties were actually joint venturers rather than lender and borrower and that the Okura entities de-

frauded them into agreeing to the December 1987 financing agreement. The seventh and twelfth causes of action allege that the Okura entities improperly induced Q.P. and participated in a scheme with Q.P. by which Q.P. purchased a competitor of Egg City. The eighth cause of action seeks a declaration that Okura–America has been charging Careau a rate of interest that is usurious. The ninth cause of action alleges that the Okura entities breached an oral contract to provide additional financing on terms similar to the December 1987 agreement. The eleventh and thirteenth causes of action allege that the Okura entities breached their implied obligation of good faith under the financing agreement and improperly interfered with Careau's corporate governance by incompetently exercising powers given to them by the financing agreement. The fifteenth cause of action, against Okura–America, seeks rescission of the financing agreement and the associated agreements and notes. The seventeenth cause of action claims that all of the defendants conspired with each other to accomplish the various misdeeds alleged in the previous sixteen causes of action. The eighteenth and nineteenth causes of action, for an injunction and accounting, merely seek remedies and are not substantive causes of action. Finally, the twentieth cause of action claims that the conduct of the Okura entities, Q.P., and Q & B constitutes unfair competition in violation of California Business and Professions Code section 17200 *et seq.*[1]

All of Careau's claims, with the possible exception of the seventh and twelfth causes of action, clearly relate to or arise out of duties created by the parties' financing agreement. Further, while the seventh and twelfth causes of action would appear at first blush to be unrelated the financing agreement, they do in fact derive from duties allegedly created by the financing agreement. Specifically, the allegation in both claims is that the Okura entities acted

improperly in participating in Q.P.'s purchase of Egg City's competitor. The only reason that conduct would be improper is that the Okura entities owed Careau a duty not to engage in such conduct by virtue of the relationship between Careau and the Okura entities created by the financing agreement. Thus, all of the claims made by Careau in the first amended counterclaim, including the seventh and twelfth causes of action, relate to the parties' financing arrangement itself or derive from duties allegedly created by the financing agreement. Thus, the jury trial waiver provision in the December 1987 agreement applies to all of the causes of action asserted by Careau against the Okura entities.

Additionally, the claims asserted by Careau against Messrs. Asakawa and Kobori derive from their role as directors of Careau. Asakawa and Kobori became directors of Careau as a result of a provision of the parties' December 1987 agreement which gave the Okura entities the right to select two members of Careau's board of directors. The claims against Asakawa and Kobori arise out of their performance of duties called for by the parties' financing agreement. Thus, Careau's claims against Asakawa and Kobori were also within the scope of the jury trial waiver contained in the December 1987 financing agreement.[2]

▮ As for the Carrotts' claims against Okura–America, the operative jury waiver, contained in each of their personal guaranties, provides that each of them and Okura–America "waive their right to trial by jury on any suit, action or proceeding brought to enforce th[e] Guaranty." The Carrotts are parties to the fifteenth cause of action which seeks rescission of all of the documents executed by the Carrotts and Careau in December 1987 and January 1988 including the notes and guaranties executed by the Carrotts. In the sixteenth cause of action, the Carrotts seek exonera-

---

1. Additionally, the court notes that the eighteenth, nineteenth, and twentieth causes of action seek equitable remedies for which Careau would not be entitled to jury trial anyway.

2. Since the claims of Careau against Q.P. and Q & B were bifurcated, the court need not consider whether they too would be within the jury trial waiver as derivative of Careau's claims against the Okura entities.

tion of their guaranties. In the eighteenth cause of action, the Carrotts seek an injunction. Each of the remedies sought in the fifteenth, sixteenth and eighteenth causes of action is equitable in nature and, thus, the Carrotts are not entitled to a jury trial on those claims. Further, the court finds that, since the fifteenth and sixteenth causes of action seek a finding that the Carrotts are not liable on their guaranties, the rescission and exoneration claims would fall within the language of the waiver provisions contained in the guaranties.

■ With regard to Richard Carrott's claims against both Okura entities, it may have been inappropriate for the court to strike his demand for jury trial on all issues. In the twentieth cause of action for unfair competition under section 17200 *et seq.* of the California Business and Professions Code, Carrott would only be entitled to equitable relief such as an injunction or restitution. Thus, no right of jury trial attaches to that cause of action. However, the fourth cause of action for breach of fiduciary duty, the sixth cause of action for fraud, and the tenth cause of action for breach of an oral contract are the types of claims to which the right to jury trial normally attaches in a civil trial. Thus, if Carrott presented a genuine triable issue of fact with regard to those claims, he was entitled to a jury trial on those claims.

■ In summary, the court finds that the jury waiver provisions contained in the December 1987 financing agreement and the associated notes and guaranties are valid and applicable to most of the causes of action alleged in the first amended complaint and first amended counterclaim.

Specifically, defendants waived their right to jury trial on the first through seventh, thirteenth, and fifteenth through twentieth causes of action alleged in the first amended complaint. Additionally, the court finds that the jury waiver applies to the first through third, fifth, seventh through ninth, and eleventh through twentieth causes of action alleged in the first amended counterclaim. Hence, to the extent triable issues of fact were presented, the defendants were entitled to a jury trial on the eighth through twelfth and fourteenth causes of action in plaintiff's first amended complaint and defendant Richard Carrott was entitled to a jury trial on the fourth, sixth, and tenth causes of action alleged in the first amended counterclaim.[3]

## II. DIRECTED VERDICTS AND SANCTIONS.

■ As is the court's practice in court trials, the parties were to submit the direct testimony of the witnesses in their cases in chief by declarations under penalty of perjury. *See Chapman v. Pacific Telephone and Telegraph Co.,* 613 F.2d 193, 197–98 (9th Cir.1979). Trial in this action was set for November 13, 1990. Pursuant to the court's civil trial preparation order, the parties' declarations were to be submitted and exchanged on October 30, 1990, two weeks before trial. Plaintiff's counsel appeared at the courthouse on the afternoon of October 30, 1990 ready to exchange declarations. Defendants were not so prepared. Plaintiff sought advice from the court as to whether it should file its declarations or wait until defendants were ready to exchange declarations. The court set a hearing for the next morning, October 31, 1990,

---

**3.** Even if a jury trial is necessary on these claims, it would not nullify the previously conducted court trial since this case does not present the issue of overlapping equitable and legal causes of action at issue in *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Under *Beacon Theatres,* the lower federal courts must preserve the Seventh Amendment right to jury trial by trying cases presenting both legal and equitable issues to a jury. *Id.* at 510–11, 79 S.Ct. at 956–57. Rather, this case involves a contractual waiver applicable to most, but not all causes of action. To the extent there are overlapping factual is-

sues, to require the jury trial to proceed first on the basis of *Beacon Theatres* would deprive plaintiff of the benefit of its bargain. Further, the issues to which the jury waivers do not apply are distinct from those to which the waivers were properly applied. In fact, the very reason the waivers are not applicable to those few causes of action is because they are not sufficiently related to the parties' 1987 financing agreement. Therefore, the possibility of a new trial limited to those issues does not undermine the court's findings with regard to the remaining issues presented.

and told plaintiff to return with its declarations to the hearing. At the hearing on October 31, 1990, plaintiff again indicated that it was ready to proceed with the exchange. Defendants, however, admitted that they were not prepared to exchange declarations. The court then ordered defendants' counsel, Michael McCann and Peter Bezak, to show cause why they should not be held in contempt and sanctioned for failing to comply with the court's scheduling order. The court invited further briefing from both sides to be filed by November 2, 1990 and set a further hearing for November 5, 1990. Additionally, the court ordered that plaintiff's declarations would be accepted for filing and that plaintiff need not serve them until it had been served with defendants' declarations, which also were to be filed by November 2, 1990. At the hearing on November 5, 1990, the court found that the conduct of defendants' counsel was willful, in bad faith, and contumacious. The court took under advisement what sanction would be appropriate. Having considered the issue, the court hereby ORDERS that counsel for defendants-counterclaimants, Michael McCann and Peter Bezak, shall each pay $1,000.00 to the Clerk of the United States District Court for the Central District of California.[4] *See Chambers v. NASCO, Inc.,* — U.S. —, 111 S.Ct. 2123, 2132–33, 115 L.Ed.2d 27 (1991) (discussing the inherent power of the court to fashion appropriate sanctions for conduct which violates court orders). The sanctions shall be paid within thirty days of the date of this order.

▆▆▆ On the morning of trial, November 13, 1990, the court considered plaintiff's motion for directed verdict on defendants' counterclaims on the ground that defendants had failed to present any competent evidence of damages resulting from plaintiff's allegedly wrongful conduct. Additionally, plaintiff argued that defendants

had violated the discovery rules by failing to provide plaintiff with an accurate list of their proposed expert witnesses and the substance of their testimony in response to interrogatories posed by the plaintiff. The plaintiff argued that the expert declarations should be excluded and that, even if admitted, the declarations failed to establish what damages were suffered by defendants.

Specifically, defendants' expert witness declarations, untimely filed as they were, failed to set forth anything other than preliminary opinions regarding the damages suffered by the defendants as a result of plaintiff's allegedly wrongful conduct.[5] Further, defendants' percipient witnesses did not provide any probative evidence on the question of defendants' damages. Rather, defendants merely claimed that their inability to earn more revenue and, thus, service the loans made by the plaintiff was due to the actions and conduct of the plaintiff. At best, defendants' contentions would have provided them with a defense or set off against plaintiff's attempt to collect the overdue loans. Those contentions, absent competent evidence of damages, did not provide them with a legal basis for affirmative relief on most of their causes of action. Since damages were an element of many of the defendants' causes of action, the plaintiff asserted that the absence of competence evidence of damages in the defendant-counterclaimants' case in chief rendered those claims legally insufficient and, thus, plaintiff was entitled to a directed verdict on those claims. *See Kruse v. Bank of America,* 202 Cal.App.3d 38, 60–61, 248 Cal.Rptr. 217, 230 (1988) (the absence of evidence of proximate causation of damages, where a necessary element of the claim, is fatal to that claim), *cert. denied,* 488 U.S. 1043, 109 S.Ct. 870, 102 L.Ed.2d 993 (1989). The court agreed and

---

**4.** The court's order to each attorney to pay $1,000.00 as a sanction for the attorneys' contumacious conduct resolves the court's October 30, 1990 oral order to show cause why they should not each be sanctioned $10,000.00.

**5.** With regard to the expert testimony, the court granted plaintiff's motion in limine excluding

expert testimony. Thus, the court did not allow the defendants to introduce most of their expert declarations. However, the court did allow, subject to plaintiff's objection, the testimony of defendants' real estate expert to be introduced by declaration, cross examination, and re-direct.

granted plaintiff's motion for directed verdict as to the first through seventh, ninth through fourteenth, and seventeenth causes of action alleged in defendants' counterclaims.

## III. THE TRIAL.

The trial in this action primarily concerned the contentions of the defendants by way of their affirmative defenses and counterclaim causes of action that the Okura entities had perpetrated a scheme to force Careau deep into debt and then foreclose on the egg ranch and other security for the loans when Careau defaulted. Defendants primarily asserted three legal theories upon which it premised its factual allegations. First, it alleged that the parties arrangement was a joint venture and that the Okura entities had breached their fiduciary duties as joint venturers with Careau and/or with Carrott and Gerald Rosen, the owner of six percent of the Careau shares.[6] The second theory of defendants was that Okura, though a lender, exercised undue control over Careau and thus assumed fiduciary duties to Careau which it breached by various acts. The third theory was that Okura had fiduciary duties to Careau via Messrs. Asakawa and Kobori, who were directors of Careau and employees of Okura. Also, defendants contend that plaintiff had fiduciary duties as its sales agent and that Okura had admitted that it owed Careau fiduciary duties. While there is no question that Asakawa and Kobori had some fiduciary duties to Careau as directors, the parties dispute the scope of those duties and whether they were breached.

Careau argued that Okura breached its fiduciary duties to Careau and/or Carrott in several different ways. First, Careau alleges that Okura failed to provide additional financing for a modernization program at the egg ranch and called the loans after Careau defaulted. Second, Okura allegedly forced Careau to enter unprofitable contracts for the sale of egg products to

Q.P., a valued customer of Okura. Third, Okura allegedly used the parties' grain purchase agreement to push Careau deeper into debt and improperly took advantage of Careau by excessively marking up the price of the grain. Fourth, Okura allegedly forced Careau to utilize the services of A.P.V. as contractor for its henhouse project when it knew that A.P.V. was not qualified. This episode allegedly resulted in a payment to A.P.V. in settlement of the dispute with no substantial work on the project having been completed. The fifth claim of breach was Okura's refusal to fund Carrott's proposal to relocate the egg ranch and to subdivide and develop the existing ranch property for residential real estate. Sixth, Careau alleged that Okura's proposed participation in Q.P.'s purchase of Henningsen, another producer of egg products, amounted to a breach of its fiduciary duties to Careau. Seventh, Okura breached fiduciary duties by failing to market Egg City's products overseas. Eighth, Careau alleges that Okura charged it interest on funds at a rate far in excess of what Okura paid for the use of those funds. Finally, the ninth claim of breach consisted of Okura's alleged bad faith attempts to impose an unfair executive employment agreement on Carrott.

### A. General Findings and Conclusions.

With regard to the defendants' first major theory that the parties were really joint venturers rather than lender and borrower, the court finds the defendants' evidence unpersuasive. Careau principally relies on internal Okura documents generated during 1987 in which employees of Okura refer to Careau and its principals as "partners." While the documents are somewhat facially supportive of Careau's assertions, they are not dispositive. *Smalley v. Baker*, 262 Cal.App.2d 824, 69 Cal.Rptr. 521, 530 (1968). The parties' negotiations during 1987 resulted in a loan agreement that was duly documented and executed in December 1987. The financing arrangement is clearly that of bor-

---

**6.** Prior to the Okura deal, Carrott owned ninety percent and Rosen owned ten percent of the stock of Careau.

rower and lender. The agreement is fully integrated and provides that it is the final expression of the parties' intent. Thus, even if the parties' contemplated a formal joint venture during their negotiations, the agreement they reached was one between a lender and borrower. *See Constans v. Ross*, 106 Cal.App.2d 381, 235 P.2d 113, 116 (1951) ("It is the intention as evidenced by the terms of the agreement ... that controls."). Further, while the court permitted defendants to introduce parol evidence on the issue of the parties' agreement, and such evidence arguably should have been excluded,[7] the court is not persuaded by the parol evidence that the parties' relationship was anything other than that formalized in the December 1987 financing agreement. Therefore, the court finds that the parties were not joint venturers and none of defendants' claims predicated on the existence of a joint venture can stand.

▇▇▇ The second major theory put forward by Careau is that Okura exercised too much control for a lender and thereby acquired fiduciary obligations with regard to Careau. Generally, the lender-borrower relationship is not a fiduciary relationship. *See Price v. Wells Fargo Bank*, 213 Cal. App.3d 465, 476, 261 Cal.Rptr. 735, 740 (1989); *Mitsui Manufacturers Bank v. Superior Court*, 212 Cal.App.3d 726, 731, 260 Cal.Rptr. 793, 796 (1989). Careau attempts to establish a special relationship here through evidence concerning the placement by Okura of Messrs. Asakawa and Kobori at Egg City and on the board of Careau. The Careau board consisted of Carrott, Rosen, Asakawa, and Kobori and required a super-majority vote, three of the four directors, for board action. Additionally, Careau relies on letters written to the Immigration and Naturalization Service in support of visa applications for Asakawa and Kobori in which Okura asserted that it would exercise control over Careau. The question, however, is not control, but rath-

er undue control. Okura provided thirteen million dollars in financing to Careau pursuant to the December 1987 agreement. Additionally, Okura loaned Careau another eight million plus dollars during 1988 and early 1989 and extended more than ten million dollars in credit for grain purchases on behalf of Careau. In the context of the parties' ongoing lender-borrower relationship, the level of control given to Okura was not undue or excessive. Rather, Okura negotiated terms that would provide it with various methods of overseeing and protecting its loans to Careau. There is nothing unusual about a lender taking a minority equity interest in the borrower or about placing directors on the board of directors of the borrower. Additionally, Okura's overt power over Careau was limited to the possibility of vetoing action proposed by Carrott; Okura did not have the power to authorize affirmative action by the board without the concurrence of either Carrott or Rosen. *Cf. Title Insurance and Trust Co. v. California Development Co.*, 171 Cal. 173, 205–06, 152 P. 542 (1915) (where lender exercises complete dominion and control over borrower's business, the lender becomes a fiduciary to the borrower). The court concludes that Okura did not exert undue control over Careau such that it had and breached fiduciary duties to Careau or that its relationship should be characterized as something other than an arms' length lender-borrower relationship. *See id.; Mitsui Manufacturers Bank*, 212 Cal.App.3d at 731–32, 260 Cal.Rptr. at 796–97.

▇▇▇ The third major theory put forward by Careau is that the Okura entities breached fiduciary duties owed to Careau by virtue of the placement of Asakawa and Kobori as directors on Careau's board. While the parties do not dispute that Asakawa and Kobori owed fiduciary duties to Careau as directors, they do dispute the scope of those duties and whether they

---

7. While California has a very weak parol evidence rule that allows the introduction of parol evidence to demonstrate a latent ambiguity in contractual language, *see Trident Center v. Connecticut General Life Insurance Co.*, 847 F.2d 564 (9th Cir.1988), California's parol evidence rule does bar the introduction of evidence of prior or contemporaneous discussions that are inconsistent with any interpretation of the written agreement. *Id.; Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 483–84, 261 Cal.Rptr. 735, 745 (1989).

were breached. However, it is important to note that Asakawa and Kobori's directorial fiduciary duties were owed to The Careau Group as a corporation and not to Carrott and Rosen. *See Treadway Cos. v. Care Corp.*, 638 F.2d 357, 377 (2d Cir.1980). Also, as merely a minority shareholder in a closely held corporation, Okura did not owe any fiduciary duties to Carrott or Rosen. *See Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 108–12, 81 Cal.Rptr. 592, 599–602, 460 P.2d 464, 471–74, (1969). In any event, neither Asakawa and Kobori nor Okura breached any fiduciary duties to Careau.

■ Most of the episodes asserted by Careau as evidence of Okura's breaches of duty do not implicate any duties that Asakawa and Kobori had by virtue of their positions as directors of Careau. The refusal to provide further financing for the modernization program, the calling of the loans in default, and the alleged fact that Okura charged Careau an interest rate far in excess of its cost of acquiring funds concern the terms of the parties financing agreement. Under the December 1987 agreement, Okura had no obligation to fund the modernization program and had the right to call the loans if they were in default. Additionally, there is nothing inappropriate about Okura profiting on the interest rate differential between its acquisition cost and the rate agreed upon between it and Careau. In fact, it would have had little incentive to loan Careau the substantial sums at issue if it would not be permitted to earn such a profit. Thus, even if Okura had a generalized fiduciary duty to Careau, it did not breach it by refusing to provide further funding for modernization, by calling the loans in default, or charging Careau a higher rate of interest than it paid to acquire the funds loaned to Careau.

■ With regard to Careau's allegations regarding the Henningsen transaction, as a result of Careau's protests, Okura did not participate in the purchase of Henningsen by Q.P. To the extent that Careau contends that the Henningsen episode amounted to an improperly diverted corporate opportunity that should have been presented to Careau, that claim is untenable. Whatever Okura did with regard to Henningsen and Q.P., there is no evidence that Asakawa and Kobori were directly responsible for Okura's activities in this regard. Further, the evidence at trial was that Henningsen was not interested in dealing with Careau and, further, that given its extraordinary debts, Careau was not in any position to seriously consider the purchase of one of its competitors. *See Rankin v. Frebank Co.*, 47 Cal.App.3d 75, 88, 121 Cal.Rptr. 348, 356 (1975). Thus, even if the Henningsen episode did amount to a diverted corporate opportunity in the abstract, Careau suffered no injury by virtue of it.

■ Careau's contention that Okura breached fiduciary duties by forcing Careau to agree to unprofitable contracts for sales to Q.P. for 1988 and by attempting to do so for 1989 is also untenable. The 1988 Q.P. contracts were agreed to in November 1987, prior to the execution of the parties' financing agreement. Thus, in November 1987, the parties were still negotiating the specifics of their proposed relationship and, after arms' length bargaining, Careau agreed to a series of contracts to supply Q.P. with egg products during 1988. Careau claims that it was forced to accept unfavorable terms. However, the evidence at trial showed that the terms of the 1988 Q.P. contracts were not all that unfavorable; at times, the contract price exceeded the market price and, at other times during 1988, it did not. Careau also argued that its losses were greater on the Q.P. contracts than the market prices would suggest since the product it sold to Q.P. was customized and cost more to produce. However, the evidence at trial demonstrated that the cost of the custom product, 11.6 per cent salted yolk, was not any greater than the regular 10 per cent salted yolk. Further, Careau's claims of greater wear and tear on its machinery were speculative. Thus, the court finds that the Q.P. contracts were not unfair. Additionally, it should be noted that, since the parties were negotiating at arms' length, it is not for

this court to second guess the parties' agreed upon bargain. The 1988 Q.P. contracts were not unconscionable as there was no evidence showing that they were grossly unfair at the time they were executed. *See Western Pac. R.R. Corp. v. Western Pac. R. Co.*, 197 F.2d 994, 1001 (9th Cir.1952)[8] (the fact of common directors and officers of companies dealing with each other is not a basis for setting aside contracts which do not demonstrate overreaching or unfairness). With regard to the 1989 Q.P. contracts, they were never executed because Careau refused to agree to Q.P.'s terms. Given Careau's ability and willingness to refuse the 1989 Q.P. contracts, its contentions that it was forced into accepting unfavorable terms are even less plausible than they might otherwise be. Hence, the court finds that, even if Okura had a generalized fiduciary duty to Careau, it did not breach that duty by bargaining for the executed 1988 Q.P. contract and the aborted 1989 Q.P contract.

■ Careau and Carrott also contend that Okura's attempt to impose an unfair executive employment agreement upon Carrott amounted to a breach of fiduciary duties. As noted above, however, Asakawa and Kobori's duties were owed to Careau and not to Carrott. Thus, the fact that Carrott felt as if he were not being fairly treated does not implicate any duty owing to Careau. *See Treadway*, 638 F.2d at 377. Additionally, Careau's contention that Okura breached fiduciary duties by refusing to consider Carrott's proposal to relocate the egg ranch and subdivide the real estate for residential development does not implicate any duties owed by Asakawa and Kobori to Careau. Further, the court notes that the evidence at trial was that the egg ranch real estate was not zoned for residential use and would not be so zoned in the foreseeable future. It is difficult for the court to conceive of what duty Okura breached by refusing to consider Carrott's speculative real estate proposals at a time when Careau was already in default on the principal loans. Thus, the court finds that Okura and/or Asakawa and Kobori breached no duty by refusing to consider Carrott's real estate proposals.

■ There are two episodes asserted by Careau that do implicate Asakawa and Kobori's directorial duties. One, Careau contends that Okura, via Asakawa and Kobori, forced Careau to use the services of A.P.V. as contractor on the henhouse project at the egg ranch though Okura knew that A.P.V. was not qualified to do the work. Again, this claim does not stand up to the evidence. First, while the hiring of A.P.V. did not work out in hindsight, the court must assess the director's action at the time it was taken. The evidence at trial was that A.P.V. had been involved in the construction of industrial food processing plants. Thus, while it had never been involved in constructing an egg processing plant, there is not a sufficient basis to conclude that the directors should have been aware that it was not qualified to do the work. Second, all of the directors voted to hire A.P.V., not just Asakawa and Kobori. Thus, the only basis for holding Okura accountable would be for the recommendation to use A.P.V. However, given A.P.V.'s experience in the food industry, it cannot be said that the recommendation of A.P.V. was so unreasonable that the court should substitute its judgment for that of the director making the recommendation. *See Findley v. Garrett*, 109 Cal.App.2d 166, 240 P.2d 421, 428 (1952) (discussing the Business Judgment Rule); Cal.Corp. Code sec. 309 (codification of the Business Judgment Rule). Careau claims that it would have preferred to use a different contractor named Amundsen. However, its preferred contractor, Amundsen, was not available at the time the construction

---

**8.** The Ninth Circuit's order denying rehearing and striking the petition for rehearing en banc, 197 F.2d at 1012, and its order denying the appellant's motion for leave to file a motion to vacate the order striking the petition for en banc hearing, 197 F.2d at 1016, was vacated by the Supreme Court, 345 U.S. 247, 267, 73 S.Ct. 656, 666, 97 L.Ed. 986 (1953), on the ground that the Ninth Circuit's procedures for obtaining en banc review of a panel decision were not clearly set forth. On remand to the Ninth Circuit, rehearing and rehearing en banc were again denied. 206 F.2d 495, 497 (9th Cir.1953).

was set to begin. Careau argues that Asakawa and Kobori breached a duty of loyalty to Careau in recommending A.P.V. as a favor to Q.P. However, this claim was not supported by the facts. From the evidence presented at trial, the court finds that the parties agreed on using A.P.V. because it was available at the desired time and appeared qualified to do the work. Simply stated, the evidence at trial does not support Careau's contention that the recommendation of A.P.V. amounted to a breach of Asakawa and Kobori's directorial duties.

▮ The second episode that implicates Asakawa's duties as a director and officer of Careau involves the grain purchase agreement. Careau contends that Asakawa, as the purchasing agent for Careau, used the credit extended via the grain purchase agreement to push Careau deeper into debt so that it would be unable to repay its debts. This claim is also untenable. At trial, Careau admitted that the grain purchased with credit provided by Okura was eaten by the Careau chickens and that the chickens may have starved without that food. Thus, the court finds that there was nothing inappropriate about Asakawa's continued purchases of grain and they did not in any way amount to a breach of his duties as a director and officer of Careau. Further, while Careau argued that Okura took an excessive profit on the grain purchased for Careau, the evidence does not support its claim. Under the grain purchase agreement, Careau agreed to pay Okura 1.5 per cent above Okura's cost with payment to be made within 45 days. Thus, Okura was simply financing Careau's grain purchase at an annual rate of 12 per cent. The court finds nothing inappropriate about the grain purchase agreement and there was no convincing evidence presented that the agreement amounted to overreaching by Okura. *See Western Pac. R.R. Corp.*, 197 F.2d at 1000.

▮ Finally, Careau contends that Okura breached a fiduciary duty owed to Careau by virtue of its agreement to be Careau's exclusive overseas sales agent. Essentially, Careau contends that, because it had no overseas sales other than those to

Q.P., Okura breached its duty. However, Careau produced no evidence supporting its claim of breach or demonstrating what damages it suffered as result of the breach. Before the December 1987 financing agreement, Q.P. was Careau's only overseas customer. There is no evidence that Careau would have attracted any other such customers in the absence of Okura. In fact, Careau's track record in this regard renders any contentions as to such possible overseas sales wholly speculative. Thus, to the extent that Okura had a duty to use its best efforts to solicit overseas customers for Careau's egg products, any failure on its part to do so did not result in any compensable damages to Careau as it failed to establish any injury resulting from Okura's breach.

▮ In summary, Careau has attempted to thread together various events to establish that Okura schemed to defraud it and to render it unable to repay approximately thirty million dollars in debt to Okura. However, the evidence presented was insufficient to establish that such a scheme was utilized by Okura. Not only was the evidence insufficient, but the scheme is somewhat implausible. Given the fact that the value of the underlying real estate was somewhat speculative given current zoning and growth plans for the areas surrounding the egg ranch, it makes little sense that Okura would continue to lend money to Careau so as to force it into default in order to allow it to foreclose on its security. The whole tenor of Careau's counterclaim is that Okura was somehow obligated to help Careau repay the thirty million dollars it had willingly accepted from Okura. In fact, what appears to have occurred is that Okura lent Careau substantial funds believing that Careau would be able to generate substantial enough revenues to service the loans and that over time Okura would help Careau by funding improvements to the ranch to increase its profitability. However, when Careau's revenues were not as promised by Carrott and when it appeared that the ranch was not becoming profitable, Okura decided that changes had to be made. The court finds there was nothing

improper about Okura's decision to pull the plug when it did and that Okura did not act so as to prevent Careau from being able to repay its debts.

### B. Findings and Conclusions Re Specific Claims.

#### 1. *The Complaint.*

In light of the court's general findings above, the court will specifically address each of the claims and counterclaims. The first through seventh claims for relief in plaintiff's complaint are claims for breach of the December 1987 loan agreement and the various notes executed by Careau in favor of Okura. As plaintiff has established the existence of these agreements, its performance pursuant to them, and that Careau has not performed and has failed to establish any viable defense to their enforcement, the court finds in favor the plaintiff on these claims. *See Reichert v. General Insurance Co. of America,* 68 Cal.2d 822, 830, 442 P.2d 377, 69 Cal.Rptr. 321, 325 (1968) (setting forth the elements of a cause of action for breach of contract); *Swanson v. Skiff,* 92 Cal.App.3d 805, 809–10, 155 Cal.Rptr. 280, 282–83 (1979) (note signed by the defendant is presumptively valid and enforceable unless defendant can prove a lack of consideration).

The plaintiff's eighth through twelfth claims for relief concern Okura's attempt to recover the approximately ten million dollars worth of credit it extended to Careau for the purchase of grain for the egg ranch. While the court has determined that the jury waiver should not have been applied to these claims, there is no factual dispute about these claims. Careau was aware of the grain purchases made on its behalf by Okura and that its chickens ate the grain. Rather, the parties' disagreement concerns the legal effect of the agreement's two million dollar limit and the effect of the contract on a recovery based on a common count. As Careau admitted that its chickens ate the grain purchased on its behalf, it enjoyed the benefit of the money loaned to it by Okura. Further, Careau never objected to or complained about the purchases by Okura above the

two million dollar limit. The court will not allow the existence of the contractual limit, which appears to have been inserted for Okura's benefit, to be used by Careau to avoid paying for approximately eight million dollars worth of grain that it used. The principle that a common count cannot be used to recover in a case where a contract denies a recovery is not applicable on the facts presented here. *See Beley v. Ventura County Municipal Court,* 100 Cal.App.3d 5, 8–9, 160 Cal.Rptr. 508, 509–10 (1979) (seller may recover in quasi-contract for value of benefits conferred even where contract not enforceable). Rather, plaintiff, having established the contract, its performance and Careau's breach, is entitled to recover two million dollars on its claim for breach of the grain purchase agreement. *See Reichert,* 68 Cal.2d at 830, 442 P.2d at 381, 69 Cal.Rptr. at 325. However, the plaintiff may also recover the additional eight million dollars it lent to Careau by virtue of the grain purchases on Careau's behalf. *Beley,* 100 Cal.App.3d at 8–9, 160 Cal.Rptr. at 509–10. Therefore, plaintiff is entitled to judgment on its eighth claim for relief for two million dollars and on its common counts, claims nine through twelve, for the remainder of the approximately ten million dollars in credit it provided to Careau for the purchase of grain.

With regard to plaintiff's thirteenth cause of action, plaintiff's documentary and testimonial evidence established the contract for the services of the Okura employees, the performance of Asakawa and Kobori pursuant thereto, the failure of Careau to pay for those services, and the defendant's failure to establish any viable defense to this claim. *See Reichert,* 68 Cal.2d at 830, 442 P.2d at 381, 69 Cal.Rptr. at 325. Therefore, plaintiff is entitled to judgment on its thirteenth claim for relief. However, with regard to plaintiff's fourteenth claim for relief, the plaintiff has failed to establish the existence of the alleged oral contract for reimbursement of shipping costs to the satisfaction of the court. Therefore, while the defendant was entitled to trial by jury on this claim, the

plaintiff's failure to make a prima facie showing renders summary judgment in defendant Careau's favor appropriate. With regard to plaintiff's fifteenth claim for relief for breach of the implied covenant of good faith and fair dealing, it is merely cumulative given the court's finding that Careau breached each of the underlying contracts. Further, the evidence at trial was insufficient to establish that those breaches were in bad faith. Rather, it appears that Careau was simply unable to pay as it was not generating sufficient revenue.

■ Plaintiff's sixteenth and seventeenth causes of action seek enforcement of the personal guaranties executed by Richard Carrott and Marie Antoinette Carrott. As the court noted above in its discussion of the jury waivers, the personal guaranties are binding and enforceable. The Carrotts have not established any viable defense to their enforcement. Therefore, the plaintiff is entitled to judgment against the Carrotts personally for the defaulted obligations of Careau. Further, it appears that plaintiff is entitled to judicial foreclosure of the real and personal property securing Careau's and the Carrott's obligations given their failure and refusal to repay the Careau debts. *See Bank of California National Association v. Leone*, 37 Cal.App.3d 444, 447–48, 112 Cal.Rptr. 394, 396–97 (1974) (a default on a secured obligation may result in judicial foreclosure over the real and/or personal property securing the debt). Thus, plaintiff is entitled to judgment on its eighteenth and nineteenth claims for relief in its first amended complaint. Finally, in conjunction with the judicial foreclosure, plaintiff is entitled to specific performance of the security agreements between the parties and the court finds that the appointment of receiver, as provided for in the Deed of Trust and Security Agreement, for the defendants' property is necessary to protect the plaintiff's interest in the interim. *See Snyder v. Western Loan & Bldg. Co.*, 1 Cal.2d 697, 702, 37 P.2d 86 (1934); *Barclays Bank of California v. Superior Court*, 69 Cal. App.3d 593, 599–602, 137 Cal.Rptr. 743, 746–48 (1977).

### 2. *The Counterclaim.*

Turning to the counterclaims asserted by Careau and the Carrotts against the Okura entities and Messrs. Asakawa and Kobori, the court will address each of the claims alleged by the defendants. Given the court's findings above that the parties were not joint venturers, that their lender-borrower relationship was at arms' length, and that Okura did not exert undue control over Careau, the first and second claims for relief for breach of a joint venture and breach of fiduciary duties fail. Further, given the court's findings above that Asakawa and Kobori did not breach their fiduciary duties to Careau, counter-claimant Careau's third claim for relief fails. Thus, counterclaim defendants are entitled to judgment on the first through third claims of the counterclaim based on the court's directed verdict for failure to produce evidence of damages as well as Careau's failure to establish a joint venture, a generalized fiduciary duty, or breach by Asakawa and/or Kobori of their directorial duties.

■ With regard to the fourth claim in the counterclaim, Carrott's claim for breach of fiduciary duty against the Okura entities, that claim fails as a matter of law. The premise of Carrott's claim is that Okura was a controlling shareholder and that he was a non-controlling shareholder. This claim is legally insufficient. Carrott owns 54 per cent of Careau while Okura only owns 40 per cent. Further, while the super-majority vote requirement gives Okura veto power over his proposals, he has the same power in conjunction with his partner Gerald Rosen with regard to Okura proposals. Therefore, the court holds, as a matter of law, that the Okura entities owed Carrott no fiduciary duties by virtue of the distribution of ownership of the corporation. *Cf. Jones*, 1 Cal.3d at 108–12, 460 P.2d at 471–74, 81 Cal.Rptr. at 599–602 (majority shareholder may have fiduciary duty to minority shareholder in closely held corporation). Hence, the denial of a jury trial on this claim was harmless error as the court has held that the claim was insufficient as a matter of law.

■ The fifth claim in the counterclaim alleged fraud by Okura in inducing Careau to agree to the December 1987 financing agreement. The court's findings outlined above dispose of this contention. Careau failed to prove that Okura intentionally or negligently misrepresented its future intentions with regard to providing financing to Careau. Rather, as the court noted above, after providing the initial financing of thirteen million dollars and subsequent financing worth more than eighteen million dollars, Okura determined that it was throwing good money after bad. Careau's revenues were not sufficient to permit it to repay its debts to Okura and Okura was under no obligation to continue funding in those circumstances. The court finds Careau's argument that it justifiably relied on alleged statements by Okura that it would not call the loans to be without support in the evidence. First, the language of the financing agreement and the various notes and schedules made it clear when payments were due. *See Price,* 213 Cal.App.3d at 484, 261 Cal.Rptr. at 745 (parol evidence rule prevents introduction of alleged oral promises contrary to written contract terms in action for promissory fraud). Thus, Careau's attempt to avoid those schedules by arguing that Okura promised it that it would not call the loans is legally insufficient. Additionally, given the clarity of the payment schedules, Careau's assertion of vague promises not to call the loans is unpersuasive and not supported by the evidence presented at trial. *Cf. Laks v. Coast Federal Savings & Loan Association,* 60 Cal.App.3d 885, 890–91, 131 Cal. Rptr. 836, 839 (1976) (in order to state a claim for promissory estoppel, the elements of which are essentially the same as a claim for promissory fraud, there must be a clear and unambiguous promise). Thus, Careau has failed to establish that Okura made any misrepresentations and that, even if Okura did so, it justifiably relied in the face of the written financing agreement. *See Kruse,* 202 Cal.App.3d at 61, 248 Cal.Rptr. at 230 (the absence of a necessary element of a fraud claim is fatal to the claim). Therefore, in addition to Careau's failure to produce evidence of damages, it has also failed to establish the other elements of its fraud claim. Hence, the counterclaim defendants are entitled to judgment on the fifth claim in the counterclaim.

■ The sixth claim in the counterclaim alleged fraud against the Okura entities by Carrott. The premise for this claim was that Carrott was fraudulently induced into pledging his stock in Careau as security for Careau's obligations and into not filing a claim in the Careau bankruptcy for sums due him under his employment contract. As the court noted above, if Carrott raised a triable issue of fact with regard to this claim, then he was entitled to a jury trial. Essentially, Carrott contended that officers of Okura told him that his stock certificates would not be transferred to Okura–Japan and would be placed in safe deposit box in the United States. Carrott also alleged that officers of Okura told him that they had no intention of removing him as chief executive officer of Careau. Finally, Carrott asserted that Okura told him not to file a claim in the bankruptcy proceeding since his new employment contract would reimburse him for sums owed under his old contract. Carrott argues that each of these statements by Okura was false when it was made in that it was always intended that his stock certificates would be transferred to Japan, that Okura intended to oust him from his position as chief executive officer and a director of Careau, and that Okura intended to use any new employment contract as a method of terminating him.

In looking at the evidence submitted by Carrott in support of this claim in the light most favorable to him, and not weighing the evidence, the court finds that no reasonable jury could find that Carrott had satisfied his burden of establishing fraud by the Okura entities. First, Carrott has not suggested how he has been injured by the location of his stock certificates in Japan as opposed to the United States or why the location of the stock certificates was important enough that he wouldn't have pledged his shares had he known the certificates would be sent to Japan. Second,

with regard to Carrott's claim that Okura induced him not to file a claim in the Careau bankruptcy by promising him a new employment contract that would reimburse him for sums already owing, Carrott has not produced sufficient evidence to establish that he justifiably relied on such statements. Rather, given the detailed negotiations and the fully documented resulting loan transaction which contains no reference to a new employment contract including reimbursement for sums allegedly owing by Careau to Carrott, no reasonable jury could find that he justifiably relied on such alleged oral statements. The only reference to an employment agreement in the loan documents merely states that an executive employment agreement between Careau and Carrott would be coming later under separate cover. Since the loan transaction was intended to take Careau out of bankruptcy, any reliance by Carrott on promises not memorialized in the parties' agreement was not justifiable. Further, Carrott's evidence regarding the intentions of Okura from the outset was not sufficient, in and of itself, to justify a verdict in his favor given his burden of proving the fraud by a preponderance of the evidence. Finally, Carrott's claimed damages of two million dollars were not sufficiently established by his direct testimony or even by the excluded expert testimony. Thus, Carrott did not present sufficient facts from which a reasonable jury could conclude that he had justifiably relied on statements by Okura to his detriment. *See Kruse,* 202 Cal.App.3d at 61, 248 Cal.Rptr. at 230 (the absence of a necessary element of a fraud claim is fatal to that claim). Therefore, even though Carrott was entitled to a jury trial on his fraud claim, he did not present sufficient facts to allow his claim to be adjudicated by a jury. Hence, the denial of a jury trial was harmless error and the Okura entities are entitled to a directed verdict on the sixth claim for relief in the defendants' counterclaim.

■ The seventh claim for relief in the counterclaim alleged that Okura interfered with Careau's prospective economic relationship with Q.P. and Q & B, *i.e.,* future sales of egg products, by inducing Q.P. to purchase Henningsen, a competitor of Careau. This claim was not borne out by the facts. Q.P. offered to purchase egg products from Careau and Careau rejected the offer. Thus, Careau is the party responsible for its loss of potential sales to Q.P. and Q & B. Nothing Okura may have done could have interfered with prospective sales that it had already rejected. Therefore, Careau failed to establish that Okura interfered with any prospective sales and Okura is entitled to judgment on the seventh claim for relief in the counterclaim.

■ The eighth claim alleged in the counterclaim seeks a declaration that Okura was charging Careau a usurious rate of interest on the funds lent to Careau and treble damages based on the excess interest paid. However, under California law, where interest in excess of the legal rate is charged and collected, the excess interest is applied to diminish the principal and no cause of action arises until the principal has been completely repaid. *In re Vehm Engineering Corp.,* 521 F.2d 186, 189 (9th Cir.1975). Thus, Careau's usury claim is premature since it has not repaid the principal.

■ Additionally, Careau has failed to establish that the rates specified in the parties' loan agreement, prime rate plus one-half per cent and prime plus one per cent, were in fact above the legal rate for such loans.[9] In order to arrive at its conclusion that Okura has charged and collected usurious interest, Careau has accumulated various items of value that it contends inflate the interest rate actually charged by Okura. Specifically, Careau alleged that Okura received ten per cent of the stock of Careau and warrants to purchase another thirty per cent at a discount-

9. Under section 1(2) of article 15 of the California Constitution, the legal rate for a business loan such as those at issue here is the higher of ten per cent or the federal funds rate plus five per cent. The applicable federal funds rate is that set by the Federal Reserve Bank of San Francisco on the 25th day of the month preceding the execution of the loan agreement or the month preceding the funding of the loan, whichever is earlier.

ed price as well as fees for Asakawa and Kobori in addition to the interest rate specified in the loan agreement. Careau alleges that the value of this consideration when added to the purported interest rate set forth in the loan agreement exceeds the legal rate of interest. However, Careau failed to show that these additional items constitute additional interest on the borrowed funds. Rather, the court finds that the fees for Asakawa and Kobori were not consideration for the loans but rather payment for the services they performed as officers and directors of Careau. Therefore, those fees should not be considered in determining the actual interest charged and collected from Careau. Additionally, with regard to the stock and warrants given to Okura, Careau did not establish to the court's satisfaction that the stock and warrants had any value at the time of the exchange.[10] Thus, Careau failed to establish that the rate of interest charged by Okura was in excess of the legal rate. Therefore, Okura is entitled to judgment on the eighth claim for relief in the counterclaim.[11]

■ The ninth claim in the counterclaim alleged that the Okura entities breached an oral contract agreed to in April of 1987 to provide thirty million dollars of financing for Careau and breached an oral contract agreed to in April of 1989 to provide an additional one million dollars in financing to Careau. The evidence presented at trial was insufficient to support either claim. With regard to the alleged April 1987 agreement to loan Careau thirty million dollars, the court's findings above that the parties had not reached any agreement until they executed the December 1987 loan agreement disposes of that claim. In April 1987, the parties were merely negotiating the terms of the agreement reached later that year. Further, as the court found above, the December 1987 agreement is a fully integrated agreement that represents the whole of the parties' agreement regarding the financing to take Careau out of bankruptcy. Thus, Careau's purported evidence of a prior oral agreement is inadmissible under the parol evidence rule. *See Price*, 213 Cal.App.3d at 483–84, 261 Cal. Rptr. at 744–45. Additionally, given the fact that Okura has loaned Careau funds and extended credit to Careau totalling approximately thirty million dollars, it is not clear to the court how the alleged oral contract was breached and what damages Careau could have suffered even if it was breached. *See Reichert*, 68 Cal.2d at 830, 442 P.2d at 381, 69 Cal.Rptr. at 325 (party asserting breach must show the other party's non-performance and the resulting damages suffered).

■ With regard to the second oral contract alleged in the ninth claim, Careau has failed to establish that there was a binding agreement to loan the additional one million dollars it claims was promised by Okura. Rather, the court finds that, during the process of negotiating the additional financing needed to complete the Phase I project, Okura determined that Careau's defaults on the existing loans were no longer acceptable and that the prudent course would be not to extend it any more credit. At the time Okura decided not to make any additional loans, the parties had not reached a binding agreement for one million dollars in financing to complete the Phase I project. *See Price*, 213 Cal.App.3d at 483, 261 Cal.Rptr. at 744 (preliminary negotiations are no substitute for a valid subsisting contract); *cf. Laks*, 60 Cal. App.3d at 890–91, 131 Cal.Rptr. at 839 (noting the need for a clear and unambiguous promise in a claim for promissory estoppel). Additionally, the court notes that Careau failed to produce any competent evidence of damages it allegedly suffered as a proximate result of what it contended were Okura's breaches of its financing commitments. Thus, the Okura entities are entitled to

---

10. The court notes that Careau was in bankruptcy and the loan agreement negotiated by the parties was intended to take Careau out of bankruptcy.

11. Since the usury claim will become mature if Okura is able to collect the principal of Careau's debt via a judgment in this lawsuit, it is appropriate for the court to rule on the usury claim at this time.

judgment in their favor on the ninth claim for relief in the counterclaim.

 The tenth claim for relief in the counterclaim seeks enforcement of an alleged oral contract to pay Carrott $1,860,-000.00 in back earnings for services provided to Careau prior to December 1987. Essentially, this is the same claim alleged by Carrott in the sixth claim for relief in the counterclaim. As noted above, if Carrott presented a triable issue with regard to this claim, he was entitled to have a jury adjudicate his claim. However, as with the sixth claim in the counterclaim, Carrott has failed to submit sufficient evidence from which a reasonable jury could find that the parties had reached an agreement to pay Carrott nearly two million dollars for services he allegedly had already performed. In fact, the evidence Carrott suggests supports his claim does not give rise to an inference that Okura had agreed to a new employment contract which would pay him back earnings. Rather, the reference to a new employment agreement in the December 1987 loan agreement merely states that an executed agreement between Careau and Carrott will be coming later under separate cover. Further, the only consideration for the allegedly promised payment was Carrott's alleged agreement not to file a claim in the Careau bankruptcy. However, since the Okura financing was going to take Careau out of bankruptcy, the court finds it highly implausible that Carrott would have given up a viable claim for nearly two million dollars on the basis of an oral promise to take care of it later. Where a claim is implausible, the party bearing the burden of proof "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Carrott has not produced any such persuasive evidence and thus has failed to raise a genuine issue for a trial by jury. Therefore, the denial of a jury trial was harmless error and the Okura entities are entitled to a directed verdict on the tenth claim for relief in the counterclaim.

 The eleventh claim for relief in the counterclaim alleged that Okura breached the implied covenant of good faith and fair dealing in each of the oral and written agreements between the parties by making misrepresentations to Careau, by causing Careau substantial losses which prevented Careau from repaying the loans, by setting impossible deadlines for Careau, and by placing Careau in a position from which it would be unable to obtain alternative financing. None of these claims were established by the evidence at trial. As for the misrepresentations allegedly made by Okura, the court has already found that Okura did not misrepresent its intentions from the outset and only pulled the plug on Careau when it became apparent that it could not repay its debts. Okura did not cause Careau substantial losses. Rather, there were periods in 1988 and 1989 when the market for egg products was not favorable to producers. Further, the evidence as to the particular problems encountered at Egg City was inconclusive as to causation. With regard to the deadlines for repayment of loans, Careau agreed to the repayment schedule and willingly accepted the financing subject to those terms. Finally, the reason Careau could not obtain alternative financing is that it had shown itself to be a poor credit risk with a history of being unable to pay its debts. Okura's decision not to continue financing Careau was not a breach of its obligation to act in good faith; rather, it was a rational decision by a lender to discontinue the extension of credit to a borrower in default. In sum, Careau has failed to establish any breach of the implied covenant by Okura. Also, Careau has not presented any competent evidence of what damages it suffered as a proximate result of the claimed breaches. Therefore, Okura is entitled to judgment in its favor on the eleventh claim for relief in the counterclaim.

 The twelfth cause of action in the counterclaim alleged that the Okura entities and Q.P. and Q & B conspired to engage in a pattern of racketeering activity for the purpose of effectuating the takeover of Careau and to defraud the Carrotts

of their personal assets. Careau claimed damages of seventy two million dollars to its business and property as a result of the conspirators' alleged RICO violations. The pattern alleged by Careau consists of frauds allegedly committed through the use of the mails. However, the evidence presented at trial does not support Careau's claim. As the court noted above, there was no grand scheme to defraud Careau and there was nothing improper about Okura's attempts to collect payments on the millions of dollars worth of loans to Careau which were in default. Careau's fanciful allegations of a grand scheme to defraud it of its business and assets are nothing more than the last act of a desperate debtor unable to meet its obligations. Thus, Careau has failed to establish the predicate acts necessary to support its RICO claim. *See Schreiber Distributing Co. v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir.1986) (in order to allege a violation of the mail fraud statute, as a predicate act under RICO, it is necessary to show, *inter alia*, a scheme or artifice to defraud). Additionally, as the court noted above, Careau has presented no competent evidence of damages it allegedly suffered as a proximate result of Okura's allegedly wrongful conduct. Therefore, the Okura entities and Q.P. and Q & B are entitled to judgment on the twelfth claim for relief in the counterclaim.[12]

■ The thirteenth claim for relief in the counterclaim alleged that the Okura entities and Asakawa and Kobori willfully and improperly interfered with the corporate governance of Careau. Again, however, the evidence presented at trial does not support Careau's allegations. First, Okura had the right to participate in the corporate governance of Careau pursuant to the parties' December 1987 financing agreement. Under the agreement, Okura became a forty per cent shareholder of Careau and was entitled to appoint two of the four directors to sit on the Careau board. Additionally, the financing agree-

ment provided that the Okura directors would also participate in the daily operations of Careau.as officers in order to help Careau become profitable. Pursuant to this authority, Asakawa and Kobori went to work at Careau's egg ranch in Ventura County and served on the board of directors. While things did not go very well at Careau in 1988 and 1989, Careau failed to establish that the cause of its problems was any intentional wrongdoing by Okura as opposed to its own internal management problems and a deteriorating market for its products. Thus, the counterclaim defendants are entitled to judgment in their favor on the thirteenth claim for relief in the counterclaim.

With regard to the fourteenth claim in the counterclaim, which alleged negligence against Asakawa and Kobori in performing their duties as directors, the court's discussion of their conduct as directors in its general findings disposes of this claim. Specifically, there was not sufficient evidence presented to establish that Asakawa and Kobori acted unreasonably in fulfilling their duties as officers and directors of Careau in 1988 and 1989. *See Findley*, 240 P.2d at 428; Cal.Corp.Code sec. 309. Thus, Asakawa and Kobori are entitled to judgment in their favor on the fourteenth claim in the counterclaim.

■ The fifteenth claim for relief in the counterclaim seeks rescission of the agreements, notes, and guaranties executed by the Carrotts and Careau in December 1987 and early 1988 on the grounds of fraud, duress, and coercion. As the court's findings make clear, there was no fraud committed by Okura, the Carrotts and Careau voluntarily agreed to the terms of the various documents they signed, and Careau willingly accepted the funds loaned to it by Okura. Additionally, Careau has not indicated that it is willing to restore the benefits it has received pursuant to the agreements it wishes to rescind. *See* Cal.Civ. Code sec. 1691(b) (requiring that the re-

---

12. While the claims against Q.P. and Q & B were bifurcated for trial, those claims were derivative of the claims against the Okura entities and actors. Since Careau failed to establish its RICO claim against the Okura entities, the court believes that it is appropriate to enter judgment in favor of Q.P. and Q & B on the RICO claim as well.

scinding party restore to the other party everything of value received under contract). Thus, the counter-claimants are not entitled to rescission of any of the agreements which they executed and, hence, Okura–America is entitled to judgment on the fifteenth claim for relief in the counterclaim.

 In the sixteenth claim for relief in the counterclaim, the Carrotts seek exoneration of their guaranties. As the court's findings with regard to Okura's claims for breach of those guaranties make clear, the court has found that the guaranties are valid and enforceable against the Carrotts and that the Carrotts have established no viable defense to their enforcement. Specifically, the Carrotts voluntarily agreed to guarantee the debts of Careau so that Careau could obtain the financing necessary to come out of bankruptcy. The court has already found that Okura was not engaged in any scheme to defraud the Carrotts or Careau. Therefore, there is no factual basis for exonerating the personal guaranties executed by the Carrotts in favor of Okura–America. Hence, Okura–America is entitled to judgment in its favor on the sixteenth claim for relief in the counterclaim.

The seventeenth claim for relief in the counterclaim alleged a conspiracy among the Okura entities, Asakawa, Kobori, Q.P., and Q & B to engage in all the wrongful conduct alleged in the first sixteen claims of the counterclaim. As the evidence presented at trial did not support any of the underlying claims, it was insufficient to support Careau's conspiracy claim. As the court noted above, it has found that Okura did not engage in a scheme to defraud Careau. Therefore, the counterclaim defendants are entitled to judgment in their favor on the seventeenth claim for relief in the counterclaim.[13]

The eighteenth and nineteenth claims for relief in the counterclaim sought the equitable remedies of injunction and accounting to help repair the injury allegedly suffered by the counterclaimants as a result of the allegedly wrongful conduct of the counterclaim defendants. However, as the court has found that the counterclaimants are not entitled to any relief on their counterclaim causes of action, there is no basis for granting them equitable remedies. Therefore, the counterclaim defendants are entitled to judgment in their favor on the eighteenth and nineteenth claims for relief alleged in the counterclaim.

The twentieth claim for relief in the counterclaim sought statutory fines and an injunction against the counterclaim defendants for violating the provisions of section 17200 *et seq.* of the California Business and Professions Code. As is abundantly clear from this order, the court has found that the counterclaim defendants did not act improperly or unfairly in their relationship with Careau and the Carrotts and committed no unfair business practice in violation of California's unfair competition statute. Therefore, the counterclaim defendants are entitled to judgment in their favor on the twentieth claim for relief in the counterclaim.[14]

### 3. *Asakawa and Kobori's Claims.*

 Asakawa and Kobori filed a counterclaim to Careau and Carrott's third party claims against them, alleging that Carrott had invaded their privacy by searching their desks in their offices at the egg ranch. The court concludes, as a matter of law, that Asakawa and Kobori did not have such an interest in the privacy of their offices vis-a-vis the chief executive officer of the corporation for which they worked that would support an invasion of privacy claim. While a public employee has a reasonable expectation of privacy in his office under the Fourth Amendment vis-a-vis a search by his public employer, it is clear that the privacy interest is not as great in the workplace as it is at home. *See O'Con-*

---

**13.** Again, while the court bifurcated the claims against Q.P. and Q & B, the court's finding that the claims underlying the alleged conspiracy were not established effectively disposes of the conspiracy claim against Q.P. and Q & B. Therefore, it is appropriate for the court to enter judgment in favor of Q.P. and Q & B on this claim as well.

**14.** *See supra* note 12.

*nor v. Ortega,* 480 U.S. 709, 717–19, 107 S.Ct. 1492, 1497–98, 94 L.Ed.2d 714 (1987). Additionally, *O'Connor* is limited to public employees and their workplaces and does not necessarily or logically apply in the private context. Further, even in a public employment context, the expectation of privacy may be reduced by virtue of the practices in the particular workplace. *Id.* In the present case, Asakawa and Kobori did not establish that they had a reasonable expectation of privacy of their offices vis-a-vis Carrott and they did not establish any damages resulting from the alleged invasion. Therefore, they are not entitled to any relief.

### CONCLUSION

Based on the foregoing the court concludes that plaintiff Okura–America is entitled to judgment on the first through thirteenth and sixteenth through twentieth claims for relief in the First Amended Verified Complaint. However, defendant Careau is entitled to judgment on plaintiff's fourteenth and fifteenth causes of action. With regard to the claims alleged in the First Amended Counterclaim, the counterclaim defendants are entitled to judgment on all of the claims therein. With regard to the counterclaim by Asakawa and Kobori for invasion of privacy, counterclaim defendants Careau and Carrott are entitled to judgment. Judgment will be entered accordingly.

■ Additionally, the court notes that, while defendants were improperly denied a jury trial on the eighth through twelfth and fourteenth causes of action in plaintiff's First Amended Verified Complaint, the error was harmless as the eighth through twelfth causes of action were decided as a matter of law on the basis of undisputed facts and the defendants prevailed on the fourteenth cause of action. Also, with regard to the fourth, sixth, and tenth claims for relief asserted by Carrott in the First Amended Counterclaim, the denial of jury trial was harmless error as he failed to present any triable issue of fact as to those claims. With regard to all other claims, the jury demand was properly denied in light of the broad waiver provisions contained the various agreements, notes, and guaranties executed the parties. Finally, the court notes that, having previously found the conduct of defense counsel in failing to file their witness declarations in a timely fashion without adequate excuse to be willful, in bad faith, and contumacious, it is hereby ORDERED that Michael McCann and Peter Bezak shall each pay ONE THOUSAND DOLLARS ($1,000.00) to the Clerk of the United States District Court for the Central District of California within thirty days of the date of this order.

IT IS SO ORDERED.

### JUDGMENT

In accordance with the court's Memorandum of Decision, it is hereby ORDERED, ADJUDGED, AND DECREED that JUDGMENT BE ENTERED as follows:

1. In favor of the plaintiff on its first through seventh claims for relief in its First Amended Verified Complaint and that plaintiff shall recover from defendant The Careau Group the principal sum of $19,-859,380.00 and interest of $5,750,400 through August 16, 1991;

2. In favor of the plaintiff on its eighth through twelfth claims for relief and that plaintiff shall recover from defendant The Careau Group the sum of $10,257,610 plus interest at the legal rate from October 31, 1989;

3. In favor of the plaintiff on its thirteenth claim for relief and that plaintiff shall recover from defendant The Careau Group the sum of $210,000.00 with interest at the legal rate from January 1, 1990;

4. In favor of the defendant The Careau Group on plaintiff's fourteenth and fifteenth claims for relief and that the plaintiff shall take nothing on its fourteenth and fifteenth claims for relief;

5. In favor of the plaintiff on its sixteenth claim for relief and that plaintiff shall recover from defendant Richard Carrott the sum of $30,326,990.00 with interest of $5,750,400 on the principal owing on the notes and at the legal rate on the remainder as set forth in items 2 and 3 above;

6. In favor of the plaintiff on its sixteenth claim for relief and that plaintiff shall recover from defendant Marie Antoinette Carrott the sum of $30,326,990.00 with interest of $5,750,400 on the principal owing on the notes and at the legal rate on the remainder as set forth in items 2 and 3 above;

7. In favor of the plaintiff on the eighteenth through twentieth claims for relief in its First Amended Verified Complaint and that judicial foreclosure is granted in favor of the plaintiff as to the real and personal property subject to the deed of trust and security agreements held by nominal defendant Commonwealth Land Title Insurance Co. and that the court will appoint a receiver upon application by the plaintiff;

8. In favor of the counterclaim and third party defendants on all of the claims in the counterclaimants First Amended Counterclaim and that counterclaimants The Careau Group, Richard Carrott, and Marie Antoinette Carrott shall take nothing by way of the counterclaims and third party claims; and

9. In favor of counterclaim defendants The Careau Group and Richard Carrott on the counterclaim asserted by third party defendants Asakawa and Kobori and that Asakawa and Kobori shall take nothing by way of their counterclaim.

IT IS SO ORDERED.